IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RICHARD SCHNEITER,

       Plaintiff,

    v.                              Case No. 21CV0135

KEVIN CARR, AMY PECHACEK, ET AL.,

       Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

Plaintiff Richard Schneiter, a former Department of Corrections (Department or DOC) deputy warden claims Defendants violated his First Amendment and Fourteenth Amendment Due Process rights when they terminated his employment following a personnel investigation into Schneiter's posting of five memes on Facebook (or "FB") that were abusive and degrading to persons of color, the Muslim community, and the LGBTQ community. Schneiter's postings (comparing Muslim children to garbage; calling the Confederate flag "our flag" and complaining about the flying of the LGBTQ flag; bragging about being called a racist; stating "Black State Senator Leaves the Democrat Plantation;" and suggesting that Muslims leaving this country was "Bacon America Great Again") were uncovered by a *Milwaukee Journal Sentinel* reporter who contacted then-Deputy Warden Schneiter for comment. During the interview with the reporter, Schneiter admitted posting the memes and made

excuses as to why he had posted them--to stimulate discussion and comment. He repeatedly communicated with the reporter using his DOC email. Schneiter's offensive FB memes became front page news: "Deputy prison warden posts Facebook meme that compares Muslim children to garbage."

Defendants did not violate Schneiter's due process rights. After being placed on paid administrative leave, conducting an investigation, and providing pre-deprivation process, DOC terminated Schneiter's employment for violations of numerous DOC work rules. He violated Work Rule 2 (Failure to comply with written agency policies and procedures by violating the DOC media policy 300.00.79 for providing the interview to Marley without approval); Work Rule 14 (Intimidating, interfering with, harassing, demeaning, treating discourteously, or bullying, or using profane or abusive language in dealing with others due to his admission that he posted the 5 memes on his FB page); and Work Rule 25 (Engaging in outside activities which may impair the employee's independence of judgment or impair the employee's ability to perform his/her duties as an employee of the state). The Secretary's Office (Defendants DOC Secretary Kevin Carr and Deputy Secretary Amy Pechacek) was the final decisionmaker on discipline and found these work rule violations to be so severe that they amounted to just cause for termination without progressive discipline. Following the Secretary's decision, Schneiter exercised his right to post-deprivation process. He grieved his termination through Step 1 and Step 2 grievances and requested and received a two-day just cause hearing before the Wisconsin Employment Relations Commission (WERC). He has not yet received a decision from

2

WERC. If he does not prevail at WERC, he has a right to judicial and appellate review. The state process available is fatal to the due process claim.

Likewise, Schneiter cannot prove a First Amendment violation because he did not engage in constitutionally protected speech. Schneiter did not speak as a private citizen and his posts do not satisfy the public concern element—they are not relating to any matter of political, social, or other concern to the community, or subject of general interest and of value and concern to the public. Even if there could be any public concern or value found in these postings, the evidence conclusively demonstrates the government's interest as an employer in promoting effective and efficient public service outweighs the employee's interest in expressing that speech. By posting these offensive, horrible memes and embracing them in an interview to a reporter while holding himself out as a DOC Deputy Warden, resulting in a frontpage *Milwaukee Journal Sentinel* article, Schneiter tarnished DOC's ability to achieve its mission and vision and put the safety and security of himself and all staff and offenders in the DOC's institutions, prisons, and correctional centers in serious jeopardy. Defendants' interest in ensuring all incarcerated persons (regardless of race, religion, or affiliation) feel safe and secure during their confinement and the ability to recruit and retain a diverse workforce greatly outweighs Schneiter's interest in posting offensive content on social media.

## BRIEF STATEMENT OF FACTS

## I. Background Facts.

Schneiter was employed as the Deputy Warden (DW) for Department of Corrections (DOC), Division of Adult Institutions (DAI), Wisconsin Correctional Center System (WCCS). WCCS has 14 centers, approximately 2,000 inmates, and 460 staff. Schneiter was responsible for program implementation, security, treatment, food service, and maintenance. He supervised the management services director, program director, security director, and directly supervised four superintendents. He was second in command in WCCS and supported the warden and her goals for the center system. (DPFOF 1, 100.)

The Deputy Warden position is a career executive position and considered by DOC to be a high-level official. The DW position includes supervisory and supervisory-related functions and performing the work of those he supervised (security staff); acting as liaison to legislators, government officials, and other external individuals and organizations regarding WCCS programs; and implementation and support of Affirmative Action/Civil Rights Compliance Plan (including reviewing hiring selection and reviewing disciplinary actions, participating in developing a plan to maximize use of resources to recruit minority staff, and establishing expectations that will not tolerate prejudices, unfairness, and harassment among staff or between staff and inmates.) A deputy warden is responsible for day-to-day operations at particular prisons and are responsible for enforcing certain policies, procedures, and carrying out DOC's mission and values. (DPFOF 11-16.)

In 2019, under Governor Tony Evers' Administration, DOC leadership endeavored to make a more equitable and just environment and to treat people with humanity and with dignity and respect as related to the overarching goal of reforming the prison system. Goals related to equity and inclusion were communicated to the wardens and deputy wardens and the mission, vision, and core values were posted on the DOC website. The DOC's vision tag line was used in official DOC documents and stated "Every Person - Every Family - Every Community Matters." (DPFOF 18-19.)

As a DOC supervisor, Schneiter was a person responsible for implementing the vision, mission, and core values of the DOC and serving as a role model for subordinates in the chain of command. Schneiter agreed that when he fails to carry out the department's mission, vision and core values, he represents the department as a workplace that condones such behavior. (DPFOF 23-25.)

The prison population generally and within WCCS where Schneiter was a supervisor was racially and ethnically diverse and included practicing Muslims. One of DOC's stated goals was to increase diversity in its workforce. WCCS had prisons in the Milwaukee, Kenosha, Racine, and Oshkosh area, which already had a more divorce workforce. Schneiter supervised a diverse workforce including African-Americans, Latinos, practitioners of Islam, and staff who identified as LGBTQ. (DPFOF 27-29.)

## II. Schneiter's Facebook Postings.

Schneiter had a FB page with 1200 friends, including a large number of people who were either current or past DOC employees. Those DOC employees with whom

Schneiter was friends on Facebook included former DOC secretaries, DAI administrators, former wardens, directors, administrators, correctional officers, sergeants, captains, at least one chaplain, and several incarcerated persons. (DPFOF 30-31.)

In 2019, Schneiter posted five (5) separate Internet "memes" in his personal Facebook page. Specifically, Schneiter shared a meme that compared Muslim children to garbage. The meme was abusive to the Muslim community and Schneiter shared it with his 1200 Facebook friends:



Schneiter did not preserve a copy of this meme nor any comments before he deleted it. Schneiter agreed that there is nothing on its face that informs his FB friends that this meme does not reflect his belief about Muslim children. (DPFOF 33-37.)

Schneiter shared a meme on his Facebook page that suggested Muslims leaving the U.S. was "Bacon America Great Again."



Schneiter agreed this depiction was offensive to Muslims, could be viewed by his 1200 Facebook friends, and there was nothing telling those friends that this was not his belief about Muslims.  (DPFOF 38-39.)

Schneiter shared a meme stating "Black State Senator Leaves the Democrat Plantation:



Schneiter agreed this could be viewed by his 1200 Facebook friends and there was nothing telling those friends that this was not his opinion about a Black state senator. (DPFOF 40-41.)

Schneiter posted a meme showing an LGBTQ flag with the sentence, "If they have the right to fly theirs" followed by a Confederate flag with the text on top of that "We deserve the right to fly ours."



This flag meme was visible to Schneiter's 1200 Facebook friends and there was no text suggesting that this was not Schneiter's opinion. (DPFOF 42-43.)

Schneiter shared a meme stating "I don't always get called racist. But when I do, I have just won an argument with a liberal."



Again, this meme was visible to Schneiter's 1200 Facebook friends and there was nothing on its face that would advise anyone viewing this that it was not Schneiter's belief. (DPFOF 44-45.)

Schneiter frequently posted about his position with DOC on Facebook and recruits employees. (DPFOF 51-59.) Schneiter claims DOC's decision to terminate him was based on political considerations. Schneiter agrees that comparing Muslim children to garbage is not a political position. (DPFOF 47.)

**III.    Milwaukee Journal Sentinel Interview and Article**

On July 16, 2019, Patrick Marley, a reporter from the *Milwaukee Journal Sentinel*, contacted Schneiter via email (at 4:31 p.m.) and telephone (voicemail).

10

Marley directed the email to Richard.Schneiter@wisconsin.gov and addressed him as "Deputy Warden" in the email. The subject of the email was "Questions from Milwaukee Journal Sentinel re Facebook posts." In the text of the email, Marley asked questions about the Facebook memes. Schneiter called Marley back and responded using his DOC email account; he never denied posting these images. Schneiter notified his supervisor, WCCS Warden Quala Champagne after he spoke to Marley, advising that the *Journal Sentinel* was writing an article about his Facebook posts. Schneiter then emailed Marley several times about his upcoming retirement. (DPFOF 60-72.)

On July 17, 2019 at 10:46 a.m., via email, Defendants DOC Deputy Secretary Amy Pechacek, DAI Administrator Makda Fessahaye, and HR Manager Kari Beier, first saw copies of the memes posted by Schneiter. DOC communications department had asked for and received copies of the memes from Marley. Upon seeing these memes, Fessahaye was immediately concerned that the memes were offensive and reflected very poorly on DOC. Fessahaye also learned that Schneiter had communicated with the *Journal Sentinel*. The DOC communications department provided a draft statement to Marley before the article was published. (DPFOF 73-76.)

On July 17, 2019, the *Milwaukee Journal Sentinel* published the article prepared by Marley: "Deputy prison warden posts Facebook meme that compares Muslim children to garbage." The article showed two of the memes posted by Schneiter. (DPFOF 77-78.)

### IV. Personnel Investigation

On July 18, 2019, DOC initiated an investigation into Schneiter's FB postings, assigned Troy Enger and Christine Preston to conduct the investigation, and Schneiter was placed on paid administrative leave. Fessahaye identified potential work rule violations including Executive Directives 2, 5, and 43 and Work Rules 2, 14, and 25. Schneiter received notice of the investigation and potential work rule violations. (DPFOF 84-92.)

On July 24, 2019, Enger and Preston interviewed Schneiter. Schneiter stated he had full control of his Facebook page and he admitted posting the memes at issue in the investigation. Schneiter said he posted the memes to get a conversation started. Enger and Preston asked Schneiter for the alleged comments he had made when sharing the memes but Schneiter stated they had been deleted and he had asked his son to delete them. [1] Enger asked Schneiter if he was familiar with E.D. 5, the Employment Harassment and Discrimination Policy. Schneiter stated that he was and admitted the memes standing by themselves could be construed as discriminatory in nature. (DPFOF 99-104.)

During the interview, Enger and Preston invited Schneiter to send them suggested people to interview. On August 1, 2019, Schneiter sent an email to Enger and Preston asking them to interview a list of people (current and former DOC employees who are Facebook friends) in the investigation. Preston and Enger took a random sample from this list to interview because they could not interview 1200 FB

---

[1] The download of Schneiter's Facebook account shows many postings but does not show any such comments; the memes at issue were completely deleted. (DPFOF 103.)

friends. They interviewed two of the witnesses proposed by Schneiter. (DPFOF 107-109.)

On August 9, 2019, Investigators Preston and Enger prepared a summary of investigation findings. They concluded Schneiter violated Work Rule 2 (Failure to comply with written agency policies and procedures by violating the DOC media policy 300.00.79 for providing the interview to Marley without approval); Work Rule 14 (Intimidating, interfering with, harassing, demeaning, treating discourteously, or bullying, or using profane or abusive language in dealing with others due to his admission that he posted the 5 memes on his FB page); and Work Rule 25 (Engaging in outside activities which may impair the employee's independence of judgment or impair the employee's ability to perform his/her duties as an employee of the state due to his admission that he posted the five memes on his FB page). (DPFOF 117.)

Enger and Preston submitted their summary of findings and conclusions to HR; the next step in the process was an infraction review team (IRT) meeting. [2] The IRT reviews the investigation and determines whether there is sufficient evidence to move forward and potentially discipline an employee. In mid-August, 2019, the IRT determined that the investigation into Schneiter's conduct warranted moving forward into the pre-disciplinary phase. At this point, the investigation proceeded to the pre-disciplinary meeting. Schneiter received notice, attended the August 27, 2019 meeting, and brought a personal representative, Brad Kosbab. Preston and Enger attended and read the investigative summary and the potential work rules that were

[2] The IRT members included the appointing authority (Fessahaye), the employee relations specialist (Brown), and the HR director (Schoeneck).

violated. Schneiter was then invited to provide information and mitigating facts for management to consider when ultimately making the discipline decision. Schneiter read a statement and provided a signed copy of the statement to the investigators. Kosbab also read a statement and provided a copy to investigators. Schneiter never provided information for management to consider that supported Schneiter's claim that he was opposing the content of those Facebook images. (DPFOF 118-125.)

## V. Discipline Recommendation.

Following the pre-disciplinary meeting, the next step was for DOC to hold a disciplinary action review team (DART). [3] The DART reviewed the evidence from the entire investigation (including statements made by and in behalf of Schneiter in the pre-disciplinary meeting) as well as relevant policies and procedures. The DART discussed whether disciplinary action was warranted and, if so, at what level. After discussion during this meeting, the DART recommended termination. (DPFOF 129.)

After the DART recommendation, the next step is review by members of the DOC's Management Advisory Team (MAT). MAT members were Employment Relations (Brown), Human Resources Manager (Beier), Office of Diversity and Employee Services (Hesselberg), and a member of the Office of Legal Counsel. Brown prepared the summary of the investigation and facilitated the MAT meeting. During Brown's preparation of the summary, she looked for comparable cases. However, DOC did not have any comparable cases where a Deputy Warden engaged in similar misconduct. The purpose of the MAT is to review (as a neutral body) the investigation

---

[3] For the Schneiter investigation, the DART was composed of the same members as the IRT (Brown, Schoeneck, and Fessahaye).

and recommend discipline based on their areas of expertise. The MAT members generally do not personally know or work directly with the subject of an investigation and do not have any emotional attachment to the outcome of the discipline. Members of the MAT do not participate in the personnel investigation. (DPFOF 130-135.)

The MAT met regarding Schneiter on October 22, 2019 and discussed the facts surrounding the investigation and the recommended discipline from DART. The MAT's recommendation was to skip progressive discipline and proceed to termination. After the MAT meets and makes a recommendation, the personnel investigation moves to the Secretary's Office for decision. (DPFOF 137-140.)

## VI. Discipline Decision

On November 5, 2019, Beier took the recommendation from the MAT (and the disciplinary routing slip) to the Secretary's Office, where the discipline decision would be made. During this meeting, Secretary Carr and Deputy Secretary Pechacek received a general synopsis and discussed the work rules and the discipline recommendations. The Secretary's office believed the only discipline that would show that DOC did not condone Schneiter's behavior and views which were directly contrary to DOC's mission, vision, and core values was termination of employment. (DPFOF 143, 154.)

## VII.  Termination Letter

On November 8, 2019, DOC issued a termination letter to Schneiter. (R-19.) [4] The termination letter cited violations of Work Rules 2, 14, and 25 and E.D. 5 and explained the decision. The postings impaired Schneiter's ability to perform his duties as a deputy warden. Schneiter's memes (adopting the Confederate flag as "our" flag, his denigration of minorities, Muslims, and the LGBTQ community) cast public doubt about Schneiter's ability to treat inmates, staff, and members of the public fairly and impartially. These postings could have a detrimental effect on establishing and maintaining strong working relationships with a diverse workforce and community partnerships and potentially interfere with DOC recruitment. Further, DOC's rehabilitative mission may be impaired when inmates become aware of apparent racial, religious, or sexual-orientation animus on the part of a DOC employee and inmates may assume DOC's actions are a product of bias rather than well-founded decision making and in pursuit of its mission. The expression of animus of this nature additionally creates safety concerns in the institutions. [5] (DPFOF 160-165.)

## VIII.  Publicity and Impact on Department

During the investigation, members of the public made complaints about Schneiter's Facebook postings. The *Wisconsin Muslim Journal* contacted DOC and requested an interview with Schneiter and others from DOC. On September 15, 2019, The *Wisconsin Muslim Journal* published an article about Schneiter's conduct.

---

[4] On November 8, 2019, Fessahaye delivered the termination decision to Schneiter by telephone at 4:15 p.m. She read the contents of the termination letter; Schneiter also received a copy of the letter via email and regular mail. (DPFOF 166.)

[5] From the time Schneiter was placed on paid administrative leave, July 17, 2019, until his termination on November 8, 2019, Schneiter was not present in any DOC correction centers, facilities, or prisons. (DPFOF 159, FN5.)

Following Schneiter's termination, the *New York Times* published an article about Schneiter's Facebook postings and interviewed his attorney, Nate Cade. Schneiter read the article; he agreed that anyone who read or subscribed to the *New York Times* also would have information about the Facebook images that appeared in his Facebook account, that those images were not private, and that content on the internet lasts forever. (DPFOF 167-172.)

## IX. State Process

Schneiter grieved his termination through a Step 1 and Step 2 Grievance. He then filed an appeal to the WERC asking for a just cause hearing. Hearing Examiner Peter Davis held a two-day hearing regarding Schneiter's termination on September 27 and 28, 2021. Schneiter was represented by counsel at the hearing, provided an opening statement, testified himself, and had the opportunity to call his own witnesses, and cross examine DOC's witnesses. Following the hearing, the parties were given the opportunity to submit post-hearing briefs and responses. The matter was fully briefed on January 4, 2022. A decision has not yet been issued. (DPFOF 173-178.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is

any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. *See Singer*, 593 F.3d at 533.

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care*, Inc., 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

## ARGUMENT

Section 1983 creates a cause of action for damages based on personal liability; a plaintiff must show the defendant's personal involvement or participation, or direct responsibility for the conditions of which he complains. *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986); *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). The doctrine of *respondeat superior*, under which a supervisor may be held liable for an employee's actions, has no application to § 1983 actions. *Adams v. Pate*, 445 F.2d 105, 107 (7th Cir. 1971).

Schneiter's claims against non-decisionmakers must be dismissed. Neither Beier nor Fessahaye made the decision to terminate Schneiter's employment. Because they did not personally participate in any adverse employment action, Schneiter cannot sustain a First Amendment or Due Process claim against them. Beier and Fessahaye should be dismissed outright.

## I. Schneiter's First Amendment Retaliation Claim Must be Dismissed Because He Did Not Engage in Constitutionally Protected Speech.

### A. Applicable Legal Principles.

To prove a First Amendment retaliation claim, a public employee must establish three elements: (1) he or she engaged in constitutionally protected speech; (2) suffered a deprivation likely to deter protected speech; and (3) the protected speech was a motivating factor in the deprivation. *Harnishfeger v. United States*, 943 F.3d 1105, 1112 (7th Cir. 2019).

To qualify as constitutionally protected speech, the plaintiff must demonstrate that (1) he or she spoke as a private citizen; (2) the speech addressed a matter of

public concern; and (3) the government's interests as an employer in promoting effective and efficient public service do not outweigh his interest in expressing that speech. *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016). Whether a public employee's speech is constitutionally protected is a question of law, even though it may include predicate factual determinations. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

The *Connick–Pickering test*, derived from *Connick v. Myers*, 461 U.S. 138, 708 (1983), and *Pickering v. Board of Education of Township High School Dist. 205*, 391 U.S. 563, 568 (1968), is a two-part test used to determine whether a public employee's speech is constitutionally protected. *See Phelan v. Cook Cnty.*, 463 F.3d 773, 790–91 (7th Cir. 2006).

1. <u>Private citizen speaking on a matter of public concern.</u>

The first step of the *Connick-Pickering* test is to determine whether the employee's speech addressed a matter of public concern. *Wozniak v. Adesida*, 368 F. Supp. 3d 1217, 1233 (C.D. Ill. 2018) (citing *Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th. Cir. 2004)). The "threshold inquiry" in this step is to determine "whether the public employee spoke as a private citizen, or instead spoke in his capacity as an employee." *Wozniak v. Adesida*, 368 F.Supp.3d 1217, 1233 (C.D. Ill. 2018) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418-421 (2006)). Stated another way, only if an employee spoke as a private citizen will the court consider whether the speech addressed a matter of public concern.

Speech satisfies the public concern element when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or subject of general interest and of value and concern to the public. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). When undertaking public-concern inquiries, courts examine the "content, form, and context" of the statements at issue, and, while none of the three factors is dispositive, content is the most important. *Kristofek*, 832 F.3d at 794; *see also Shreffler v. City of Kankakee*, 2021 WL 6200764, at *22 (C.D. Ill. 2021).

2. *Pickering* balancing test--whether the government's interest as an employer outweighs the employee's interest in expressing certain speech.

If the court determines the speech at issue satisfies the public interest prong, the next step is application of the *Pickering* balance test--whether the government's interest as an employer in promoting effective and efficient public service outweighs the employee's interest in expressing that speech.

The *Pickering* balancing test contemplates a fact-intensive inquiry into a number of interrelated factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform their responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a

member of the general public. *Lalowski, v. City of Des Plaines*, 789 F.3d 784, 791 (7th Cir. 2015).

In *Lalowski*, the Seventh Circuit closely examined the government's "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 790 (citation omitted). The court held the city's interests in running an efficient and effective police department outweighed Lalowski's speech interests, even where statements directly addressed matters of public concern. *Id.* at 793.

The plaintiff, Lalowski was a police officer who had contact with abortion demonstrators while on duty. The version of events differ, with protesters claiming Lalowski used profanity and threat of arrest, and Lalowski denying he used profanity or made threats. He then left the area and returned to the police station. *Id.* at 787-88. While at the station, Lalowski became upset over the images of aborted fetuses used by the demonstrators. After he was off duty, he returned to the clinic in plain clothes using his personal vehicle. He approached someone, asked if she remembered him, and stated he was off duty and not representing anyone. He then engaged in discussions over the beliefs held by demonstrators and their use of aborted-fetus signs which could hurt someone who had a miscarriage. There was a discussion over whether the truth sometimes hurts and Lalowski allegedly called one of the demonstrators "fat" and a "fat fucking cow" and a "sinner of gluttony." He also placed hands on and hugged a demonstrator and stayed on site for over one hour. A

demonstrator called 911 to ask for assistance dealing with Lalowski. *Id.* at 788-89. Following this incident, Lalowski's employment was terminated.

The court found some of Lalowski's speech touched upon matters of public concern. While Lalowski spent much of his time "hurling profanity and insults" at the demonstrators, he also expressed disapproval of their use of the aborted-fetus signs. This disapproval brought Lalowski into the realm of the *Pickering* balancing test where nearly all of the factors weighed heavily against Lalowski.

First, his speech had the potential to create problems in maintaining discipline and harmony in the police department. A showing of actual disruptiveness is not required; "a government employer is allowed to consider 'the potential disruptiveness' of the employee's speech." *Id.* at 791, citing *Kokkinis v. Ivkovich*, 185 F.3d 840, 846 (7th Cir. 1999). The employer "is not required to wait until those working relationships actually disintegrate if immediate action might prevent such disintegration." *Id.*, citing *Breuer v. Hart*, 909 F.2d 1035, 1040 (7th Cir. 1990). By causing such a large disturbance, Lalowski positioned himself in opposition to the goals of his employer, thus compromising the harmony of the department for which he worked. The department could not reasonably be expected to police protests of any sort if it condoned such behavior. *Id.* at 792.

The court also noted that the potential for disruption was exacerbated by the second factor, the importance of personal loyalty and confidence in the employment relationship. "Speech that might not interfere with work in an environment less dependent on order, discipline, and *esprit de corps* could be debilitating to a police

force." Thus, "[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement." *Id.* at 792 (citations omitted).

Turning to the third factor, Lalowski's speech directly conflicted with his responsibilities as a police officer because one of those responsibilities was to foster a relationship of trust and respect with the public. By attacking private citizens with profane and disrespectful language, Lalowski compromised the community's trust in its police officers, thus failing in one of his most important duties. *Id.*

Fourth, the time, place, and manner of speech weighed against Lalowski. While he confronted the protestors at the time and place they chose to protest, the manner in which he spoke was unjustified. Lalowski aggressively ridiculed and touched the protestors, and his words and deeds were abusive and degrading, falling well below the standard of conduct the public expects from police officers, even while off duty. *Id.*

The fifth factor considered was the context in which the underlying dispute arose. Lalowski's termination occurred against the backdrop of his disciplinary history, which included five suspensions and two written reprimands. In light of Lalowski's history of problematic interactions with the public, the city had a substantial interest in preventing further hostility. *Id.*

The sixth factor—whether the matter was one on which debate was vital to informed decision-making—is the only factor that weighed in favor of Lalowski's

speech interests. Any organized protest could benefit from informed debate regarding its methods. *Id.*

Finally, although Lalowski was off duty when he engaged in the speech at issue, the court concluded he could not be regarded as a member of the general public. He first confronted the demonstrators while on duty, in an encounter even he characterizes as "adversarial." He then left the clinic, only to return off duty. Although he also told them that he was "not [t]here representing anybody," he conceded that he wanted them to know he was a police officer so they would show him respect. Because Lalowski represented himself as an off-duty police officer, rather than as a mere private citizen, the court could not find that he was speaking as a member of the general public. *Id.* at 792-93.

At bottom, the court found the state's interest in running an efficient and effective police department outweighed Lalowski's speech interest, even in relation to his statements that directly addressed matters of public concern. Six out of the seven *Pickering* factors favored the state's interests over Lalowski's. The court held that none of Lalowski's statements to the demonstrators were constitutionally protected and affirmed the district court's dismissal. *Id.* at 793.

## B. Schneiter does not state a First Amendment retaliation claim against the Defendants.

Schneiter bears the burden proof on all three elements in a First Amendment Retaliation claim. [6] He cannot prove the first and most important element, that he engaged in constitutionally protected speech. *See Harnishfeger*, 943 F.3d at 1112. His speech was not made as a private citizen, did not address a matter of public concern, and the State's interest in running an efficient and effective workplace substantially outweighs Schneiter's speech interests under the *Connick-Pickering* test.

1. <u>Schneiter did not speak as a private citizen.</u>

Schneiter's First Amendment claims fails the threshold inquiry of the *Connick-Pickering* test, speech as a private citizen, because Schneiter was regularly holding himself out as a DOC employee and even recruiting for DOC on his FB page. Several months before Schneiter posted the memes at issue he posted the link to apply for jobs, asking people to share and spread the word. (DPFOF 51, 55.) His regular communication with past and present DOC employees on FB combined with posting of DOC-related comments and even using his Facebook page to recruit new DOC employees (of which recruiting and retention is one of his job duties) takes his Facebook posts out of the realm of private citizen speech. *See Garcetti*, 547 U.S. 410. He cannot pick and choose, either he is a Deputy Warden for DOC on FB or he keeps his DOC authority to himself. Using FB to recruit DOC employees places his speech outside the realm of private citizen speech.

---

[6] For the purpose of summary judgment only, Defendants will not address the second and third elements necessary to a First Amendment Retaliation claim: he suffered a deprivation likely to deter protected speech and the protected speech was a motivating factor in the deprivation. Schneiter's employment was terminated for the posting of offensive discriminating memes on Facebook that made it impossible for him to perform the duties of his position.

2.  <u>Schneiter's offensive memes did not address a matter of public concern.</u>

Even if one assumes Schneiter spoke as a private citizen, his speech only satisfies the public concern element if it has value to public discourse. *See Snyder*, 562 U.S. 443, 453 (2011). Examining the offensive memes through the "content, form, and context" lens leads to the conclusion that these memes have no value to public discourse. The content is abusive and degrading to persons of color, the Muslim community, and the LGBTQ community. Schneiter compared Muslim children to garbage. It is difficult to imagine any content which is less likely to have public value.

The form of the speech was memes (photographs or videos with embedded captions or phrases) posted on Schneiter's Facebook page. The page was visible to 1200 of Schneiter's friends, including current and former DOC employees and several incarcerated persons. There were undoubtedly people who identify with the particular groups attacked by Schneiter given the wide audience, not to mention the ease in which people share and forward postings on Facebook. The form of Schneiter's speech does not support finding speech to be a matter of public concern.

Finally, looking at the context (the components of text that surround a word or passage and help the reader to understand its meaning) does not support public concern. Schneiter admitted that he posted nothing along with these offensive memes that gave any indication that he opposed the content. Quite the contrary, any person viewing these memes would assume that they reflected Schneiter's views. (DPFOF 37, 39, 41, 43, 45.) There is no evidence Schneiter ever commented or disavowed these were his beliefs. Schneiter claims these comments existed, but he deleted them and

they have never been recovered. (*See* Ex. 527.) Schneiter cannot meet his burden showing that these memes actually contained any comments from him that might, arguably, place them in the realm of public concern. On their face, these memes are disparaging, discriminatory, harassing, and demeaning and impact anybody who is in the DOC's care, employed by DOC, and DOC community partners who may identify with the particular groups referenced in the memes. Schneiter cannot prove otherwise.

In addition, whether the *Journal Sentinel* published an article is not dispositive of whether Schneiter was speaking on a matter of public concern. The pivotal question is not the actual presence of public controversy, but whether the speech might inform the public debate on an issue of legitimate interest to the public at the time it is published. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 381 (7th Cir. 2009). Media coverage is not dispositive of public concern, the public's curiosity about a matter does not equate with the matter having societal ramifications. *Id.*

Thus, Schneiter's speech fails the content, form, and context analysis and the postings do not qualify as matters of public concern. *See id.*

3.  <u>Even if the Court determines the offensive memes minimally qualify as addressing matters of public concern, the State's interest in running an efficient and effective workplace substantially outweighs Schneiter's speech interest.</u>

If Schneiter can satisfy the first prong of *Connick-Pickering*, speech related to matters of public concern, the next step is the *Pickering* balancing test. Here, all factors weight heavily against Schneiter.

First, his speech only needs to create potential problems in maintaining discipline and harmony in DOC. A showing of actual disruptiveness is not required as DOC is specifically allowed to consider "the potential disruptiveness" of Schneiter's speech and is not required to wait for a prison riot or employee retention and recruitment to completely disintegrate. *See Lalowski,* 789 F.3d at 791. By posting discriminatory and offensive FB posts which became front page news, Schneiter positioned himself in direct opposition of the core values, mission, and vision of the DOC, thus compromising the harmony of the department for which he worked. DOC cannot supervise diverse people in custody and recruit and retain a diverse workforce with a racist and homophobic deputy warden. *See id.* at 792. The first factor weighs heavily in favor of Defendants.

The first and second *Pickering* factors go hand in hand relating to Schneiter's specific position as a DOC deputy warden. The potential for disruption is significantly exacerbated by the second factor, the importance of personal loyalty and confidence in the employment relationship. DOC depends on order and discipline in prisons and correctional centers and uses a military/law enforcement model (officers, sergeants, lieutenants, and captains.) Here, as in *Lalowski*, deference to DOC's judgment regarding the disruptive nature of Schneiter's speech is especially important in the safe management of prisons. *See Lalowski* 789 F.3d at 792. The second factor weighs in favor of Defendants.

Turning to the third factor, Schneiter's speech directly conflicted with his responsibilities as a deputy warden. His job duties included supervision of people in

DOC's custody with diverse racial, ethnic, and religious backgrounds, as well as those who identified as LGBTQ. Additional duties included recruiting, retaining, and supervising diverse employees, and acting as a liaison to the legislature and community leaders. By posting disparaging, discriminatory, harassing, and demeaning memes, Schneiter compromised the inmates', employees', and community's trust in a high-level DOC leader, thus failing in one of his most important duties. These memes further damaged DOC's credibility by communicating discriminatory beliefs, mocking children and comparing them to garbage, referring to the Confederate flag as our flag, and further undermining the DOC mission and ability to perform daily operations. *See Lalowski* 789 F.3d at 792. The third factor weighs heavily against Schneiter.

Fourth, the time, place, and manner of speech weighed against Schneiter. While he posted the offensive memes in a public space, allegedly outside of his work hours, the manner in which he spoke cannot be justified. Schneiter's memes were abusive and degrading, compared Muslim children to garbage, which is admittedly not any type of political speech, falling well below the standard of conduct the public expects from an on or off-duty deputy warden. Moreover, the article about Schneiter's behavior appeared on the front page of the *Milwaukee Journal Sentinel* which further increased the exposure of the disparaging comments to the vast readership throughout the state and nationally. And people in custody have access to the *Journal Sentinel. See Lalowski* 789 F.3d at 792. This factor also weighs against Schneiter.

The fifth factor to be considered is the context in which the underlying behavior arose. A person in a career executive position should know better than to publicly demean racial minorities, religious groups, and the LGBTQ community. In light of Schneiter's posts and the frontpage news article, DOC had a substantial interest in preventing hostility. *See Lalowski* 789 F.3d at 792. The fifth factor weighs in favor of the Defendants.

The sixth factor—whether the matter was one on which debate was vital to informed decision-making—also weighs in favor of the State's interests. As argued in great detail in Section IIB2, there was no public interest in these offensive and racist memes. The memes were certainly not vital to informed decision-making. *See Lalowski* 789 F.3d at 792.

Finally, although Schneiter alleges he was off duty when he posted these memes, he simply cannot be regarded as a member of the general public. He is Facebook friends with 1200 people, many of whom are current and former DOC employees. He regularly posts about his long and storied career with DOC, 42 years. And he recruits DOC employees using his Facebook page. Although he claims he posts as a private citizen, there is no question Schneiter wants people to know he is a high-ranking DOC leader.  Because Schneiter regularly represented himself as a long standing and high-ranking DOC leader, he cannot say that he was speaking as a member of the general public. *See id.* at 792-93. The final factor weighs against Schneiter.

As in *Lalowski*, Defendant decisionmakers' (the Secretary and Deputy Secretary of the DOC) interest in running a safe, efficient, and effective Department of Corrections substantially outweighs Schneiter's interest in posting discriminatory, degrading and offensive memes with absolutely no public concern. The posting of these memes could impact Schneiter's safety and the lives of others because prison is already dangerous without creating additional life/safety risks and animosity based on a belief that DOC (through Schneiter) was treating individuals differently based on religion, race, or sexual orientation. Indeed, all seven *Pickering* factors favor Defendants' interests over Schneiter. Thus, none of the offensive memes qualify as constitutionally protected speech. *See id.* at 793.

Schneiter cannot prove the most important element of a First Amendment Retaliation claim, constitutionally protected speech. Thus this claim fails and must be dismissed as against all Defendants.

### C. Schneiter fails to state a claim under the Wisconsin State Constitution Article I, Section III – Free Speech.

Schneiter also seeks money damages for the Defendants' alleged retaliatory acts, claiming a violation of his rights under article I, section 3 of the Wisconsin Constitution. There is no law authorizing money damages for such a claim, except a single narrow exception—the taking of property without just compensation. *See W.H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 634-35, 460 N.W.2d 787 (Ct. App. 1990). Schneiter has not made a takings claim. This claim likewise fails. *Lelinski v. Duran*, 2018 WI App 8, ¶ 10, 379 Wis. 2d 767, 909 N.W.2d 210, 2017 WL 6375988, at *3 (unpublished disposition).

Furthermore, a state law retaliation claim must "rise or fall" with a federal First Amendment claim, because the state constitution affords the same free speech protections as those of the First Amendment. *Olmsted v. Sherman*, 2009 WL 1615541, at *6 (W.D. Wis. 2009)(citing *Lawson v. Housing Authority*, 270 Wis. 269, 274, 70 N.W.2d 605, 608 (1955)). Because Schneiter's First Amendment claim fails, his state law claim also fails. Defendants are entitled to summary judgment on the state law claims. *Olmsted v. Sherman*, 2009 WL 1615541, at *6 (W.D. Wis. 2009).

## II.   **Because Schneiter Received Pre- and Post-deprivation Constitutional Due Process, He Cannot Meet the Burden of Proof.**

### A. Applicable Legal Principles.

To succeed on a procedural due process claim, a plaintiff must establish all of the following elements: (1) a cognizable liberty or property interest under the Fourteenth Amendment; (2) a deprivation of that liberty or property interest; and (3) a denial of due process. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013).  Plaintiff does not state a procedural due process claim because he was never denied process.

Constitutional due process requires notice and an opportunity to be heard prior to state action. *Simpson v. Brown Cty.*, 860 F.3d 1001, 1006 (7th Cir. 2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). While a state may provide more extensive pre-deprivation administrative remedies, failure to adhere to them will not offend the constitution. *Id.*; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an

opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.")(citation omitted). In its truncated form, 'pretermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.'" *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 537 (7th Cir. 2008) (quoting *Gilbert v. Homar,* 520 U.S. 924, 929 (1997)).

Courts analyzing due process claims, particularly in the employment context, look to the "adequacy of pretermination procedures" in light of "the extent of post-termination procedures" provided by state law. *Michalowicz*, 528 F.3d at 534. "Only if there is no provision for a post-termination hearing must the pre-termination hearing provide all the procedural safeguards" due. *Id.* (quoting *Swank v. Smart*, 898 F.2d 1247, 1256 (7th Cir. 1990)). And while employees have "an independent right to a pretermination proceeding…, when adequate post-termination proceedings exist, a pretermination hearing need only provide 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Id.* at 536 (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985).

In *Michalowicz*, a public employee asserted violation of his due process rights because he was terminated by an allegedly biased hearing panel. 528 F.3d at 535–36. The hearing panel's decision was subject to judicial review. Holding that a state law

post-deprivation remedy should not be found to violate the Constitution unless it is "inadequate to the point that it is meaningless or nonexistent," the court determined the plaintiff could not state a due process claim. *Id.* at 534-35, 538. (citation omitted).

## B. Schneiter received and is currently receiving all process that is due.

### 1. Schneiter received sufficient pre-deprivation process.

Defendants agree Plaintiff had a property interest in his employment. State law mandates that Schneiter has civil service rights and could only be dismissed for just cause. Thus he established a properly interest in his job. Defendants also agree Schneiter suffered a deprivation of property when Carr and Pechacek terminated his employment. *See Mann*, 707 F.3d at 877.

Schneiter's claim against Defendants cannot survive because his employer provided him with Constitutionally adequate pre-deprivation procedures. "In its truncated form, 'pretermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.'" *Michalowicz*, 528 F.3d at 537 (quoting *Gilbert v. Homar,*520 U.S. 924, 929 (1997)).

On July 18, 2019, Fessahaye initiated an investigation into Schneiter's FB postings and placed Schneiter on paid administrative leave. Schneiter received notice of the investigation and potential work rule violations. (DPFOF 92, 94.) Enger and Preston conducted a thorough personnel investigation and prepared a detailed summary. (DPFOF 117.) The investigative summary was sent to HR. The IRT reviewed the summary and determined work rules were violated.  The investigation

proceeded to the pre-disciplinary meeting. Schneiter received notice, attended the August 27, 2019 meeting, and brought a personal representative. Enger and Preston read the investigative summary and the potential work rules that were violated (Work Rule number 2, number 14, and number 25 and Executive Directive 5 and DAI policy 300.00.79.) Schneiter was then provided the opportunity to be heard. He read a statement, which was placed in the investigative packet. Kosbab also read a statement that was accepted as well. Schneiter had the opportunity to provide evidence of the alleged FB comments, but he never did. (DPFOF 121-125.)

Schneiter received notice and an opportunity to be heard. The Constitution requires nothing more when adequate post-deprivation remedies are available.

2. <u>The State's post-deprivation procedures are more than constitutionally adequate.</u>

Schneiter is currently receiving process via the Wisconsin Employment Relations Commission's (WERC or commission) hearing and appeals process through Wis. Admin. Code ch. ERC 91-95, Civil Service Appeals. The rules in chs. ERC 91 to 95 are adopted by the commission pursuant to Wis. Stat. §§ 230.44(4)(bm), 230.45 (1)(i) and (3) and 230.89(1) and relate to the commission's jurisdiction under Wis. Stat. § 230.45. *See* Wis. Admin. Code § 91.01. It is the purpose of the WERC to independently determine whether just cause existed for termination. The burden of proof in an appeal of a discharge decision with WERC is on the respondent (the State). *Reinke v. Personnel Board*, 53 Wis. 2d 123, 191 N.W.2d 833 (1971).

WERC provides a neutral hearing examiner and the opportunity for a full evidentiary hearing. Wis. Admin. Code §§ ERC 94.01, 94.03. The WERC final decision

is subject to judicial review. Wis. Stat. §§ 227.52-53. The reviewing court can set aside, modify, or remand a state administrative decision if the agency's decision "has been impaired by a material error in procedure or a failure to follow prescribed procedure," if the agency misinterpreted the law, if its decision is not supported by the evidence, or if it abused its discretion." Wis. Stat. § 227.57. Any party, including the state agency, may secure a review of the final judgment of the circuit court by appeal to the court of appeals. Wis. Stat. § 227.58.

Hearing Examiner Peter Davis held a two-day hearing regarding Schneiter's termination on September 27 and 28, 2021. Schneiter was represented by counsel at the hearing, provided an opening statement, testified himself, had the opportunity to call his own witnesses, and cross examine DOC's witnesses. Following the hearing, the parties were given the opportunity to submit post-hearing briefs and responses. The matter was fully briefed on January 4, 2022. A decision has not yet been issued. (DPFOF 173-178.)

"The whole idea of a procedural due process claim is that the plaintiff is suing because the state failed to provide adequate remedies." *Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003). Although "a plaintiff is not required to exhaust state remedies to bring a § 1983 claim, this does not change the fact that no due process violation has occurred when adequate state remedies exist." *Id*. Schneiter cannot meet his burden of proof that the state failed to provide adequate process. He is in the middle of availing himself to State-afforded remedies. He may well prevail

at the WERC. And he has not even reached the stage where he can seek state court judicial and appellate review. Thus, Schneiter's due process claim fails.

### III.    Schneiter's Official Capacity Due Process Claims Must be Dismissed.

To the extent Schneiter is making an official capacity claim against individual Defendants (alleging Defendants were affecting the custom and policy of the State of Wisconsin, Dkt. 1 at ¶11), they are entitled to sovereign immunity.

State officials acting in their official capacities are not "persons" for the purposes of an action under 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  An official capacity suit against a state official is not a suit against the official but rather is a suit against the official's office, and "is no different from a suit against the State itself." *Id.* Thus, the Eleventh Amendment bars actions in federal court against state officials sued in their official capacities.  *See Edelman v. Jordan,* 415 U.S. 651, 663 (1974); *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985); *Will,* 491 U.S. at 70-71; *MSA Realty Corp. v. State of Illinois*, 990 F.2d 288, 291 (7th Cir. 1993) (state officials sued in their official capacities cannot be sued for money damages).

There are three specific exceptions to Eleventh Amendment immunity to lawsuits in federal court: (1) Congress has abrogated the state's immunity from suit through an unequivocal expression of its intent to do so through a valid exercise of its power; (2) a state has properly waived its immunity and consented to suit in federal court; and (3) the plaintiff "seek[s] prospective equitable relief for ongoing violations of federal law … under the *Ex Parte Young* doctrine." *Sonnleitner v. York*, 304 F.3d

704, 717 (7th Cir. 2002) (citing *Marie O. v. Edgar*, 131 F.3d 610, 614-15 (7th Cir. 1997) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55-56 (1996) and *Ex Parte Young*, 209 U.S. 123, 159-60 (1908))). Here, the first two exceptions do not apply because Congress has not abrogated the State's immunity from suit under section 1983, and Wisconsin has not waived its immunity and consented to suit.

As for the third exception, State employees may be sued in their official capacities in federal court, but *only* for prospective relief to end ongoing violations of federal constitutional law or statutory provisions. *Ex parte Young*, 209 U.S. 123, 156-57 (1908). To avoid the Eleventh Amendment bar, a plaintiff must allege that the state officer is currently acting in violation of federal law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

The complaint must seek prospective relief to address this ongoing violation, not compensation or other retrospective relief for violations past. *Green v. Mansour*, 474 U.S. 64, 68 (1985); *Quern v. Jordan*, 440 U.S. 332, 346-49 (1979). As the Seventh Circuit has explained, "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges [1] an ongoing violation of federal law and [2] seeks relief properly characterized as prospective.'" *Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871, 873 (7th Cir. 2013) (citing *Verizon Maryland Inc. v. Public Service Commission of Maryland,* 535 U.S. 635, 645 (2002)); *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323, 336-37 (7th Cir. 2000). When the plaintiff does not allege an "ongoing

violation of federal law," a federal court may not issue equitable relief. *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir. 1986).

In *Sonnleitner v. York*, 304 F.3d 704 (7th Cir. 2002), the court affirmed dismissal of Sonnleitner's official capacity claim for injunctive relief requesting reinstatement to a supervisory position based on alleged procedural due process violations. The Seventh Circuit acknowledged that Sonnleitner's request for reinstatement can "certainly be characterized as prospective relief," but it ultimately held: "we do not believe that the underlying procedural due process claim can be reasonably construed as 'ongoing.'" *Id.* at 718. The court found that the allegations alleged, at most, a past rather than ongoing violation of federal law. *Id.* Because the allegations did not fit the narrow exception of *Ex Parte Young*, the Seventh Circuit concluded the official capacity claims were barred by the Eleventh Amendment. *Id.* at 718-19.

Here, there is no ongoing violation of federal law by any individual Defendant. Schneiter has alleged a procedural due process claim surrounding his termination, which cannot reasonably be construed as ongoing. *See id.* at 718. Since Schneiter does not allege an ongoing violation, the Court cannot issue equitable relief. *See Watkins*, 789 F.2d at 484. To the extent Schneiter is asserting official capacity claims against individual State Defendants, those claims must be dismissed.

## IV.   **Defendants Are Entitled to Qualified Immunity.**

Even if the Court declines to grant summary judgment on the basis of the undisputed facts presented above, Defendants are entitled to qualified immunity.

### A.     Applicable Legal Principles.

Qualified immunity protects government officials from facing suits for damages when their actions do not violate clearly established constitutional or statutory rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Once a defendant asserts a qualified-immunity defense, the plaintiff has the burden to establish that the defendant's action violated a clearly established right. *Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir. 2010). To be clearly established, a right must be sufficiently clear "that *every* reasonable official would have understood that what he is doing violates that right. *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012) (internal quotations and brackets omitted) (emphasis added). This is an extremely high bar. *Kramer v. Pollard*, 497 F. App'x 639, 642 (7th Cir. 2012). To defeat a qualified-immunity defense, a plaintiff need not point to a case that is factually identical to the present suit, but "existing precedent must have placed the statutory or constitutional question *beyond debate.*" *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (emphasis added). Courts may decide qualified-immunity cases on the ground that a defendant's action did not violate a clearly established right without reaching the question of whether a constitutional right was violated at all. *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

The Seventh Circuit recently decided a case which focused on the extent to which a right must be clearly established. *Leiser v. Kloth*, 933 F.3d 696 (7th Cir. 2019). The right must be clearly established to a degree of specificity that a government official would be able to identify the constitutional violation with a specific set of facts. *Id.* at 702.  In *Leiser*, the plaintiff claimed a correctional officer intentionally inflicted

psychological harm upon him when she refused to modify her correctional duties based on his self-report that standing behind him exacerbated his PTSD. No medical or psychological staff had made such a diagnosis, nor issued restrictions to accommodate this alleged reaction to a correctional officer positioned behind him. *Id.* at 700.

The district court determined that Leiser had the right to be free from intentionally inflicted psychological harm and denied qualified immunity. The Seventh Circuit reversed, finding the general right to be free from such harm lacked sufficient specificity. The appellate issue was whether it was clearly established that the defendants were constitutionally required to accommodate the plaintiff's unique mental health needs based solely on the inmate's self-reporting, as supported by the demands of other inmates. *Id.* at 703. Existing Seventh Circuit precedent establishes that not every [psychological] discomfort experienced by an inmate amounts to a constitutional violation. *Id.*, citing *Calhoun*, 319 F.3d at 939. The specific facts of the case and existing precedent provided the correctional officer who stood behind the plaintiff with qualified immunity. Since the correctional officer was entitled to qualified immunity, the *Leiser* court also dismissed claims against the supervisor and warden for failure to protect/intervene from actions that they could not have reasonably known was unconstitutional. *Leiser,* 933 F.3d at 705.

Courts may decide qualified-immunity cases on the ground that a defendant's action did not violate a clearly established right without reaching the question of whether a constitutional right was violated at all. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

**B.     There is no clearly established law that Schneiter's offensive FB postings amounted to constitutionally protected speech, given his high level position in DOC.**

There is no clearly established law stating Schneiter was engaged in constitutionally protected speech.  In fact, the opposite is true. As set forth in detail in Section I, the *Lalowski* decision is on all fours with Schneiter and supports Defendants' decision that this speech was not constitutionally protected and termination was necessary to maintain DOC operations.

In *City of San Diego v. Roe*, 543 U.S. 77 (2004), a police officer posted sexually explicit videos on an online auction site and was terminated for off-duty conduct. The Supreme Court held officer's activities, though outside the workplace and purportedly about subjects not related to his employment, had injurious effect on mission of his employer and were not entitled to First Amendment protection; the officer's speech did not touch on "matter of public concern" and thus was not subject to *Pickering* balancing. *Id.* at 83-84.

In *Kokkinis*, the plaintiff police officer appeared on a television news program that was reporting on a fellow officer's allegation of sex discrimination by the police chief. 185 F.3d at 842. Kokkinis commented generally on the police chief's "vindictiveness" and claimed that he made many officers' lives miserable. *Id.* Kokkinis was reprimanded and filed suit. The court held that his speech was unprotected by the First Amendment because, although sex discrimination in the police department is undoubtedly a matter of public concern, he "had a limited interest in speaking on [that] subject," he knew little about the allegations, and he

43

sought "simply to further his own goal of expressing his displeasure with the Chief's policies." *Id.* at 844.

There is no evidence that any Defendant violated clearly established law regarding Schneiter's First Amendment rights. In fact, the caselaw supports the termination and underlying reasoning. Thus, Defendants are entitled to qualified immunity on this claim.

### C.   There is no clearly established law that Defendants violated Schneiter's Due Process Rights.

Defendants followed the DOC Executive Directive and Rules regarding employment investigations and discipline. These rules more than satisfy the constitutional pre-termination requirements--notice and opportunity to be heard. Thus, Defendants did not violate any clearly established law regarding pre-termination.

Furthermore, officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision. *Davis v. Scherer*, 468 U.S. 183, 194 (1984). To the extent Plaintiff argues that Defendants failed to follow civil service progressive discipline during the pre-termination process, that does not defeat their right to qualified immunity. Progressive discipline is not a constitutional requirement.

As for post-termination process, Defendants did not violate any clearly established rights. Schneiter is availing himself of state process which allows him to grieve his termination and receive a full evidentiary hearing before the WERC. Following the WERC decision, Schneiter is provided with a right to judicial review of

that decision where the court can set aside, modify, remand upon evidence of material procedural errors, mistakes of law, erroneous evidentiary findings, or abuse of discretion. *See* Wis. Stat. § 227.57. He also has the right to appeal the circuit court decision.

There is no evidence that any Defendant violated clearly established law with regard to Schneiter's pre- and post-termination Due Process rights. Rather, Defendants complied with all constitutional requirements and are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant their Motion for Summary Judgment and dismiss the Complaint in its entirety.

Dated: March 8, 2022

> JOSHUA L. KAUL
> Attorney General of Wisconsin
>
> s/Gesina S. Carson
> GESINA SEILER CARSON
> Assistant Attorney General
> State Bar #1055162
>
> RACHEL L. BACHHUBER
> Assistant Attorney General
> State Bar #1052533
>
> Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1672 (Carson)
(608) 266-0188 (Bachhuber)
(608) 294-2907 (Fax)

bachhuberrl@doj.state.wi.us
carsongs@doj.state.wi.us