IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RICHARD SCHNEITER,

    Plaintiff,

v.                                                                         Case No. 21CV0135

KEVIN CARR, AMY PECHACEK, ET AL.,

    Defendants.

**REPLY BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Richard Schneiter, a former Department of Corrections (Department or DOC) deputy warden claims Defendants violated his First Amendment and Fourteenth Amendment Due Process rights when they terminated his employment following a personnel investigation into Schneiter's posting of five memes on Facebook (or "FB") that were abusive and degrading to persons of color, the Muslim community, and the LGBTQ community. Schneiter's postings (comparing Muslim children to garbage; calling the Confederate flag "our flag" and complaining about the flying of the LGBTQ flag; bragging about being called a racist; stating "Black State Senator Leaves the Democrat Plantation;" and suggesting that Muslims leaving this country was "Bacon America Great Again") were uncovered by a *Milwaukee Journal Sentinel* reporter who contacted then-Deputy Warden Schneiter for comment. During the interview with the reporter, Schneiter admitted posting the memes and made

excuses as to why he had posted them--to stimulate discussion and comment. He repeatedly communicated with the reporter using his DOC email. Schneiter's offensive FB memes became frontpage news: "Deputy prison warden posts Facebook meme that compares Muslim children to garbage."

Defendants did not violate Schneiter's due process rights. After being placed on paid administrative leave, conducting an investigation, and providing pre-deprivation process, DOC terminated Schneiter's employment for violations of numerous DOC work rules. He violated Work Rule 2 (Failure to comply with written agency policies and procedures by violating the DOC media policy 300.00.79 for providing the interview to Marley without approval); Work Rule 14 (Intimidating, interfering with, harassing, demeaning, treating discourteously, or bullying, or using profane or abusive language in dealing with others due to his admission that he posted the 5 memes on his FB page); and Work Rule 25 (Engaging in outside activities which may impair the employee's independence of judgment or impair the employee's ability to perform his/her duties as an employee of the state). The Secretary's Office (Defendants DOC Secretary Kevin Carr and Deputy Secretary Amy Pechacek) was the final decisionmaker on discipline and found these work rule violations to be so severe that they amounted to just cause for termination without progressive discipline. Following the Secretary's decision, Schneiter exercised his right to post-deprivation process. He grieved his termination through Step 1 and Step 2 grievances and requested and received a two-day just cause hearing before the Wisconsin

Employment Relations Commission (WERC). [1] If he does not prevail at WERC, he has a right to judicial and appellate review. The state process available is fatal to the due process claim.

Likewise, Schneiter cannot prove a First Amendment violation because he did not engage in constitutionally protected speech. Schneiter did not speak as a private citizen and his posts do not satisfy the public concern element—they are not relating to any matter of political, social, or other concern to the community, or subject of general interest and of value and concern to the public. Even if there could be any public concern or value found in these postings, the evidence conclusively demonstrates the government's interest as an employer in promoting effective and efficient public service outweighs the employee's interest in expressing that speech. By posting these offensive, horrible memes and embracing them in an interview to a reporter while holding himself out as a DOC Deputy Warden, resulting in a frontpage *Milwaukee Journal Sentinel* article, Schneiter tarnished DOC's ability to achieve its mission and vision and put the safety and security of himself and all staff and offenders in the DOC's institutions, prisons, and correctional centers in serious jeopardy. Defendants' interest in ensuring all incarcerated persons (regardless of race, religion, or affiliation) feel safe and secure during their confinement and the ability to recruit and retain a diverse workforce greatly outweighs Schneiter's interest in posting offensive content on social media.

---

[1] Hearing Examiner Peter Davis issued a preliminary decision finding DOC had just cause for termination on April 8, 2021. Either party can object to the preliminary decision, submit briefing, and the full Commission will issue a final decision.

3

# ARGUMENT

**I. Schneiter's response to Defendants' Proposed Facts does not create any materially issues of disputed facts, is largely composed of argument, and is borderline sanctionable.**

Schneiter has no defense to his conduct which was abusive and degrading to persons of color, the Muslim community, and the LGBTQ community, over which he had authority and power as a high-ranking DOC official. Even at this stage of the proceedings, Schneiter nit-picks and argues about many mundane background facts for which he has no reasonable basis to dispute. He objects to and disputes the terminology used by Defendants when referring to the Facebook postings or memes and will not admit to even the most clearly undisputed findings of fact. For example, Defendants proposed fact 32 is taken directly from Plaintiff's complaint and states: In 2019, Plaintiff Richard Schneiter posted five (5) separate Internet "memes" in his personal Facebook page. (Dkt. 1:4, ¶ 15.) And in Schneiter's declaration filed with this court he states under oath: "Sometime in 2019, I posted five (5) separate Internet "memes" in my personal Facebook page." (Dkt. 45:2, ¶ 8.) In the face of the undisputed evidence submitted by Schneiter himself, that he did indeed post five memes at issue in 2019, he shockingly disputes Defendants' proposed fact 32: "Disputed. Plaintiff objects to this proposed finding of fact as to whether there were only five "memes" posted to Plaintiff's personal Facebook page" and does not cite to any evidence in the record. (Dkt. 43:8.) As to the first meme at issue in which Muslim children are compared to garbage, (DPFOF 34), Schneiter agreed this meme would be viewed as inappropriate by the Muslim Community and so testified during the WERC hearing.

4

(Dkt. 23, Tr. at 47:10-24.) Yet his response to this proposed finding was: "Disputed. Plaintiff objects to this finding of fact as it mischaracterizes testimony. Schneiter testified that Defendant's Exhibit 1, page 1 would be viewed as inappropriate by the Muslim Community." (Dkt. 23, Tr. at 47:10-13.) He then takes the same untenable position as to all five memes and the undisputed facts based on his own testimony. (Dkt. 43:8-13.)

Plaintiff even objects to Defendants' facts regarding positions, length of employment, and duties held by Defendants and material witnesses. (*See* Dkt. 43:2-4.) Plaintiff objects to or disputes 44 of Defendants' Proposed Facts without citing any evidentiary materials. (Dkt. 43 and Def's Reply to Response.) He also provides argumentative responses with evidence that does not sufficiently dispute the fact for 12 more facts. (Dkt. 43 and Def's Reply to Response.)

Schneiter does not create any dispute issues of material fact with his baseless objections and non-responses to Defendants' Proposed Findings of Fact. The Court should accept Defendants Proposed Facts (Dkt. 29) as undisputed. *See* DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E). If the DPFOF are admitted, Defendants are entitled to summary judgment. *See, e.g.*, *Saddler v. Jeanpierre*, No. 19-CV-560, 2020 WL 433884, at *1 n.1 (E.D. Wis. 2020)(citing *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

## II. Fessahaye and Beier did not personally participate in any violation of rights.

Section 1983 creates a cause of action for damages based on personal liability; a plaintiff must show the defendant's personal involvement or participation, or direct

5

responsibility for the conditions of which he complains. *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986); *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). The doctrine of *respondeat superior*, under which a supervisor may be held liable for an employee's actions, has no application to § 1983 actions. *Adams v. Pate*, 445 F.2d 105, 107 (7th Cir. 1971).

Schneiter argues that liability attaches because Fessahaye drafted the Notice of Work Rule Violations and Fessahaye and Beier participated in the IRT meeting. (Dkt. 47: 10.) This argument is without merit. Schneiter's claims are premised on his termination, not the fact that an investigation occurred or the IRT recommended discipline. Neither Beier nor Fessahaye made the decision to terminate Schneiter's employment, which is the claimed violation. Because they did not personally participate in the adverse employment action, Schneiter cannot sustain a First Amendment or Due Process claim against them.

### III. The undisputed facts demonstrate Schneiter does not state a First Amendment retaliation claim.

#### A. Schneiter did not engage in constitutionally-protected speech.

Schneiter does not address Defendant's arguments regarding the elements necessary to prove that his speech was constitutionally protected--a private citizen speaking on matters of public concern. Defendants set forth appropriate case law and argued that Schneiter did not engage in constitutionally protected speech because he did not speak as a private citizen. He regularly bragged about his long and storied career as a high-ranking DOC official and even recruited employees using his FB account. (Dkt. 26:20-21, 28.) Second, Defendants set out in great detail the ways in

6

which the content, form, and context of the offensive discriminatory speech did not qualify for constitutional protection. (Dkt. 28:20-21, 27-28.) Schneiter does not address the content, form, and context of his alleged protected speech at all. Instead, Schneiter simply states in one sentence that the subject matter of his speech was the type of speech and in the manner that usually is protected--LGBTQ issues, immigration, liberal vs. conservative matters, and the hoisting of the Confederate flag. (Dkt. 47:8.) Schneiter's failure to address these arguments amounts to waiver.

As to the merits, speech only satisfies the public concern element if it has value to public discourse. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011). Examining Schneiter's offensive memes through the "content, form, and context" lens leads to the conclusion that these memes have no value to public discourse. The content is abusive and degrading to persons of color, the Muslim community, and the LGBTQ community. Schneiter compared Muslim children to garbage. It is difficult to imagine any content which is less likely to have public value. And, indeed, Schneiter admitted comparing Muslim children to garbage is not a political matter. (DPFOF 47, undisputed.) Schneiter's argument that the topics shift his racist and discriminatory speech into the public concern arena is meritless.

Finally, looking at the context (the components of text that surround a word or passage and help the reader to understand its meaning) does not support public concern. Schneiter admitted that he posted nothing along with these offensive memes that gave any indication that he opposed the content. Quite the contrary, any person viewing these memes would assume that they reflected Schneiter's views. (DPFOF

7

37, 39, 41, 43, 45.) There is no evidence Schneiter ever commented or disavowed these were his beliefs. Schneiter claims these comments existed, but he deleted them and they have never been recovered. (*See* Ex. 527.) Nonexistent comments that Defendants cannot verify are hearsay, and Schneiter's intentional deletion of the comments entitle the Defendants to a spoliation inference. *Bracey v. Grondin*, 712 F.3d 1012, 1018 (7th Cir. 2013). On their face, these memes are disparaging, discriminatory, harassing, and demeaning and impact anybody who is in the DOC's care, employed by DOC, and DOC community partners who may identify with the particular groups referenced in the memes. Schneiter cannot prove otherwise.

Schneiter also argues that the standard articulated in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("NTEU") applies to Schneiter's claims, not *Connick*. (Dkt. 47:16.) This argument is without merit. The *NTEU* analysis only applies to challenges to a policy impacting a broad class of employees. In *NTEU*, the Court struck down a federal law that prohibited all federal employees from receiving honoraria for writing and speaking on matters unrelated to their official duties. The *NTEU* record included examples such as a mail handler who was paid for lecturing on Quaker history, an aerospace engineer who was paid for lecturing on African American history, and a biologist who earned money by writing and speaking about dance performances. 513 U.S. at 461. Justice Stevens's opinion for the Court also reminded readers that authors Nathaniel Hawthorne, Herman Melville, Walt Whitman, and Bret Harte had all published (and been paid for) their famous works while employed by various federal agencies. *Id.* at 464–65.

8

The Seventh Circuit set forth the requirements for claims where the *NTEU* analysis is applicable:

> The key issues under *NTEU* are whether the employee's speech is made outside the workplace; involve[s] content largely unrelated to [her] government employment and is addressed to a public audience, or, what amounts to the same thing, involves any matter for which there is potentially a public. If the employee shows these elements, and if the employer cannot show the employee's speech was linked by her deliberate steps to the employer's mission, purpose, or image, then *NTEU*, not *Connick*, controls, and *Pickering* balancing applies.

*Harnishfeger v. United States*, 943 F.3d 1105, 1113–14 (7th Cir. 2019)(internal citations and quotations omitted.)

Schneiter's speech was nothing like that which the Court addressed in *NTEU*. *NTEU* involved a blanket prohibition on federal employees being paid for speech unrelated to their work such as lecturing on Quaker and African-American history, and writing and speaking about dance performances. The speech did not impact their work in any manner. Here, Schneiter's speech directly conflicted with his responsibilities as a deputy warden and the DOC's mission and vision. His job duties included supervision of people in DOC's custody with diverse racial, ethnic, and religious backgrounds, as well as those who identified as LGBTQ. Additional duties included recruiting, retaining, and supervising diverse employees, and acting as a liaison to the legislature and community leaders. By posting disparaging, discriminatory, harassing, and demeaning memes, Schneiter compromised the inmates', employees', and community's trust in a high-level DOC leader, thus failing in one of his most important duties. DOC demonstrates how Schneiter's speech was

9

linked by his "deliberate steps" to the employer's mission, purpose, or image. Thus, *NTEU* does not apply. *See Harnishfeger*, 943 F.3d at 1114.

### B. The State's interest in running an efficient and effective workplace substantially outweighs Schneiter's speech interest.

Schneiter admits the memes on their face, are offensive, but claims being abusive was not Schneiter's intent and if only the memes as they appeared on Schneiter's page still existed it would show he was only interested in intellectual discourse. (Dkt. 47:18.) The problem with Schneiter's argument is that he deleted the only evidence of this alleged intellectual speech. What remains (Exs. 501 and 527) shows nothing even remotely suggesting these memes do not represent Schneiter's horrific and publicly-expressed views and opinions on the diverse groups over which he exercised substantial power and authority.

Schneiter also argues there is no definitive evidence that inmates had access to them or that there were documented complaints regarding Schneiter's posts. (Dkt. 47: 18.) Defendants disagree. It is undisputed that inmates have the *Milwaukee Journal Sentinel*, which ran a frontpage article on Schneiter's posts and showed two of them. (DPFOF 87, undisputed.) Regardless, there is no requirement of definitive evidence of actual problems caused by his posting of discriminatory and offensive memes. His speech only needs to create potential problems in maintaining discipline and harmony in DOC. A showing of actual disruptiveness is not required as DOC is specifically allowed to consider "the potential disruptiveness" of Schneiter's speech and is not required to wait for a prison riot or employee retention and recruitment to completely disintegrate. *See Lalowski, v. City of Des Plaines,* 789 F.3d 784, 791 (7th

Cir. 2015). By posting discriminatory and offensive FB posts which became frontpage news, Schneiter positioned himself in direct opposition of the core values, mission, and vision of the DOC, thus compromising the harmony of the department for which he worked. DOC cannot supervise diverse people in custody and recruit and retain a diverse workforce with a racist and homophobic deputy warden. *See id.* at 792. The first factor weighs heavily in favor of Defendants.

The first and second *Pickering* factors go hand in hand relating to Schneiter's specific position as a DOC deputy warden. The potential for disruption is significantly exacerbated by the second factor, the importance of personal loyalty and confidence in the employment relationship. DOC depends on order and discipline in prisons and correctional centers and uses a military/law enforcement model (officers, sergeants, lieutenants, and captains.) Here, as in *Lalowski*, deference to DOC's judgment regarding the disruptive nature of Schneiter's speech is especially important in the safe management of prisons. *See Lalowski* 789 F.3d at 792. The second factor weighs in favor of Defendants.

Turning to the third factor, Schneiter's speech directly conflicted with his responsibilities as a deputy warden. His job duties included supervision of people in DOC's custody with diverse racial, ethnic, and religious backgrounds, as well as those who identified as LGBTQ. Additional duties included recruiting, retaining, and supervising diverse employees, and acting as a liaison to the legislature and community leaders. By posting disparaging, discriminatory, harassing, and demeaning memes, Schneiter compromised the inmates', employees', and

11

community's trust in a high-level DOC leader, thus failing in one of his most important duties. These memes further damaged DOC's credibility by communicating discriminatory beliefs, mocking children and comparing them to garbage, referring to the Confederate flag as our flag, and further undermining the DOC mission and ability to perform daily operations. *See Lalowski* 789 F.3d at 792. The third factor weighs heavily against Schneiter.

Fourth, the time, place, and manner of speech weighed against Schneiter. While he posted the offensive memes in a public space, allegedly outside of his work hours, the manner in which he spoke cannot be justified. Schneiter's memes were abusive and degrading, compared Muslim children to garbage, which is admittedly not any type of political speech, falling well below the standard of conduct the public expects from an on or off-duty deputy warden. Moreover, the article about Schneiter's behavior appeared on the frontpage of the *Milwaukee Journal Sentinel* which further increased the exposure of the disparaging comments to the vast readership throughout the state and nationally. And, again, people in custody have access to the *Journal Sentinel. See Lalowski* 789 F.3d at 792. This factor also weighs against Schneiter.

The fifth factor to be considered is the context in which the underlying behavior arose. A person in a career executive position should know better than to publicly demean racially diverse groups, religious groups, and the LGBTQ community. In light of Schneiter's posts and the frontpage news article, DOC had a substantial

12

interest in preventing hostility. *See Lalowski* 789 F.3d at 792. The fifth factor weighs in favor of the Defendants.

The sixth factor—whether the matter was one on which debate was vital to informed decision-making—also weighs in favor of the State's interests. There was no public interest in these offensive and racist memes. The memes were certainly not vital to informed decision-making. *See Lalowski* 789 F.3d at 792.

Finally, although Schneiter alleges he was off duty when he posted these memes, he simply cannot be regarded as a member of the general public. He is Facebook friends with 1200 people, many of whom are current and former DOC employees. He regularly posts about his long and storied career with DOC, 42 years. And he recruits DOC employees using his Facebook page. Although he claims he posts as a private citizen, there is no question Schneiter wants people to know he is a high-ranking DOC leader, just as the officer did in *Lalowski*. Because Schneiter regularly represented himself as a long standing and high-ranking DOC leader, he cannot say that he was speaking as a member of the general public. *See id.* at 792-93. And, more importantly, he gave an interview to a reporter and admitted the memes were his. Schneiter then sent the reporter follow up emails from his DOC email account about his plans for retirement. By these acts, Schneiter, himself, cancelled out any inference that he was acting as a private citizen. The final factor weighs against Schneiter.

As in *Lalowski*, Defendant decisionmakers' (the Secretary and Deputy Secretary of the DOC) interest in running a safe, efficient, and effective Department of Corrections substantially outweighs Schneiter's interest in posting discriminatory,

13

degrading and offensive memes with absolutely no public concern. The posting of these memes could impact Schneiter's safety and the lives of others because prison is already dangerous without creating additional life/safety risks and animosity based on a belief that DOC (through Schneiter) was treating individuals differently based on religion, race, or sexual orientation. Indeed, all seven *Pickering* factors favor Defendants' interests over Schneiter. Thus, none of the offensive memes qualify as constitutionally protected speech. *See id.* at 793.

### IV. Schneiter fails to state a claim under the Wisconsin State Constitution Article I, Section III – Free Speech.

Schneiter concedes there is no law authorizing money damages for such a claim, except a single narrow exception—the taking of property without just compensation. *See W.H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 634-35, 460 N.W.2d 787 (Ct. App. 1990). (Dkt. 47:19.) This admission is fatal to his state law claim.

### V. Schneiter Received Pre- and Post-deprivation Constitutional Due Process.

To succeed on a procedural due process claim, a plaintiff must establish all of the following elements: (1) a cognizable liberty or property interest under the Fourteenth Amendment; (2) a deprivation of that liberty or property interest; and (3) a denial of due process. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013). Plaintiff does not state a procedural due process claim because he was never denied process. Plaintiff admits he was allowed to submit grievances and appealed the DOC decision, he received a hearing, both parties presented their evidence, witnesses, and exhibits

while represented by counsel, and had the opportunity to testify and cross examine the opposing sides' witnesses, and submit post-hearing briefs.

Schneiter, however, still misses the essential elements of a due process claim. He argues that he should not have had to go through the process in the first place. (Dkt. 47:8.) Incredibly, Schneiter claims he was deprived of due process because he was never given prior notice that he may be subject to disciplinary action as a result of his social media posts. According to Schneiter, regardless of the discriminatory and offensive posts, he could not be terminated unless there was an on-point social media policy. (Dkt. 47:20, 22.) Schneiter's argument is without merit. Schneiter was a high level DOC official with 40+ years of experience working at DOC. He knew full well that his deputy warden position included significant job responsibilities relating to a diverse work force and inmate population. Schneiter's claim that he was not on notice that publicizing racist and discriminatory views would impact his continued employment as a high level DOC leader is without merit. It is undisputed that Schneiter was well-aware at the time of the personnel investigation interview that his posts were discriminatory in nature. (DPFOF 104, undisputed.)

Schneiter concedes he was charged with and found to have violated Work Rule 2: Failure to comply with written agency policies and procedures; Work Rule 14: Intimidating, interfering with, harassing, demeaning, treating discourteously, or bullying, or using profane or abusive language in dealing with others; and Work Rule 25: Engaging in outside activities which may impair the employee's independence of judgment or impair the employee's ability to perform his/her duties as an employee

of the state. It is undisputed that Schneiter received notice of all potential rule violations. (DPFOF 88-92, undisputed.) The investigation proceeded to the pre-disciplinary meeting. Schneiter received notice, attended the August 27, 2019 meeting, brought a personal representative, and received an investigative summary with the potential work rules that were violated (Work Rule number 2, number 14, and number 25 and Executive Directive 5 and DAI policy 300.00.79.) Schneiter was then read a statement, which was placed in the investigative packet, and had the opportunity to provide evidence of the alleged FB comments, but he never did. (DPFOF 121-125, undisputed.) Schneiter received adequate notice and an opportunity to be heard.

Schneiter argues that Defendants were required to follow the progressive discipline policy and because there are no serious acts of misconduct involving social media, the policy was not followed. (Dkt. 47:23.) Policies allow accelerated discipline to termination and skip of progressive discipline for serious acts and policy violations. (See Ex. 503 at 2-3; E.D. 2, Ex. 505 at 3, 6-8.) The rule violations outlined above amounted to serious workplace violations that could warrant acceleration of progressive discipline and result in termination. The DOC Secretary and Deputy Secretary ultimately exercised their authority to accelerate discipline based on serious acts of misconduct and terminate Schneiter's employment. (DPFOF 144-152, undisputed.)

Schneiter argues at great length that he was entitled to DOC identifying a comparator in order to accelerate progressive discipline directly to termination. (Dkt.

16

47:24-26.) Schneiter's argument misses the mark. In a prior case, *Lisa Purtue v. DOC*, DOC was able to identify comparators. Here, Kelli Brown looked for comparators but there were no cases where a deputy warden engaged in similar conduct. (DPFOF 133, undisputed.) The fact that no high level DOC official had previously been terminated for publicizing racist and discriminatory views against diverse groups over which he exercised considerable power and authority does not and should not protect Schneiter from being the first.

Schneiter also argues that the investigation into his conduct was biased and incomplete because DOC was unable to obtain the Facebook posts and does not have an investigation handbook. (Dkt. 47:26.) Schneiter provides no law at all and certainly does not provide a legal basis for this Court to deem the investigation biased because DOC does not have an investigation handbook. Both Enger and Preston were experienced investigators who had been trained and conducted numerous personnel investigations. (DPFOF 7-8, undisputed.)

Further, there is no requirement that DOC obtain the original postings. It is undisputed that prior to the Schneiter interview, Preston attempted to view the comments mentioned by Schneiter by going to his FB page. Through a search using his name, Preston could only locate a photograph of Schneiter and a female showing his page. (DPFOF 98, undisputed.) Schneiter was asked to produce the posts and comments but he never did, because the memes and alleged comments had already been deleted by him or at his direction before the investigation commenced. (DPFOF 102-103, undisputed.) The posts and comments were requested in discovery.

17

Schneiter provided a full download of his Facebook page and those posts and alleged comments have disappeared. (DPFOF 103, undisputed.) Schneiter has provided no legal argument that the alleged deficiencies in the investigation amounted to a denial of due process.

Moreover, even if the investigation was in any way biased or inadequate, Schneiter admitted that he received a full hearing before the WERC and is entitled to judicial review and appeals. (DPFOF 173-178, undisputed.) And the reviewing court can set aside, modify, or remand a state administrative decision if the agency's decision "has been impaired by a material error in procedure or a failure to follow prescribed procedure," if the agency misinterpreted the law, if its decision is not supported by the evidence, or if it abused its discretion." Wis. Stat. § 227.57. Any party, including the state agency, may secure a review of the final judgment of the circuit court by appeal to the court of appeals. Wis. Stat. § 227.58.

"The whole idea of a procedural due process claim is that the plaintiff is suing because the state failed to provide adequate remedies." *Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003). Although "a plaintiff is not required to exhaust state remedies to bring a § 1983 claim, this does not change the fact that no due process violation has occurred when adequate state remedies exist." *Id*. Schneiter cannot meet his burden of proof that the state failed to provide adequate process. He is in the middle of availing himself of State-afforded remedies. And he has not even reached the stage where he can seek state court judicial and appellate review. Thus, Schneiter's due process claim fails.

18

## VI. Schneiter's Official Capacity Due Process Claims Must be Dismissed.

Plaintiff failed to respond to Defendants' argument that any official capacity claims must be dismissed. Failure to respond to an argument results in waiver. *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010).

## VII. Defendants Are Entitled to Qualified Immunity.

Once a defendant asserts a qualified-immunity defense, the plaintiff has the burden to establish that the defendant's action violated a clearly established right. *Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir. 2010). Schneiter cannot meet his burden. Schneiter argues that Defendants are not entitled to qualified immunity because the parameters of First Amendment speech rights are well-known. (Dkt. 47:28.) He cites *Wernsing v. Thompson,* 423 F.3d 732, 737 (7th Cir. 2005). *Wernsing* is not applicable here as it dealt with a pre-clearance directive where a government supervisor was seeking to manage communication between staff. It has nothing to do with a high level official posting offensive content on Facebook and is thus not sufficiently specific under the recently-articulated degree of specificity required under *Leiser v. Kloth.* 933 F.3d 696 (7th Cir. 2019.)

Schneiter does not address Defendants' argument that they are entitled to qualified immunity for the Due Process claim. Failure to respond to an argument results in waiver. *See Bonte,* 624 F.3d at 466.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant their Motion for Summary Judgment and dismiss the Complaint in its entirety.

Dated: April 11, 2022.

JOSHUA L. KAUL
Attorney General of Wisconsin

s/Gesina S. Carson
GESINA SEILER CARSON
Assistant Attorney General
State Bar #1055162

RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1672 (Carson)
(608) 266-0188 (Bachhuber)
(608) 294-2907 (Fax)
bachhuberrl@doj.state.wi.us
carsongs@doj.state.wi.us