IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RICHARD SCHNEITER,

    Plaintiff,

v.                                          Case No. 21CV0135

KEVIN CARR, AMY PECHACEK, ET AL.,

    Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

Defendants, by their attorneys, Wisconsin Attorney General Joshua L. Kaul and Assistant Attorneys General Gesina S. Carson and Rachel L. Bachhuber, respond to Plaintiff's Proposed Findings of Fact, as follows:

1.  Schneiter was employed as Deputy Warden of the Wisconsin Correctional Center System from June 19, 2011 to November 8, 2019. Declaration of Richard Schneiter, dated March 31, 2022 at ¶ 4 (hereafter "Schneiter Decl.").

**RESPONSE:  No dispute.**

2.  Before that, he had worked with the DOC since 1977, originally starting as a correctional officer, and eventually earning promotion to several high-ranking positions. Id.

**RESPONSE:  No dispute.**

3. Throughout his forty-two years of service with the DOC, Schneiter was regarded as an excellent employee who was particularly recognized for his capacity to interact with inmates and DOC staff. Id. at ¶ 7.

**RESPONSE: No dispute.**

4. The Defendant, Wisconsin Department of Corrections, Schneiter's former employer, is an administrative department responsible for state prisons and community supervision

**RESPONSE: Objection. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this proposed fact. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

5. Sometime in 2019, Schneiter posted five (5) separate Internet memes in his personal Facebook p-age, in which he did not identify himself as a DOC employee. Id. at ¶ 8.

**RESPONSE: Disputed. Schneiter regularly identifies himself as a long term high ranking DOC employee and has posted links to apply for employment with DOC. (Carson Decl. Ex. 527 at 32, 37, 40, 45, 113, 193, 240, and 305.)**

6. These memes were only viewable by Schneiter's curated list of Facebook friends, and not by the general public, let alone inmates. Id.

**RESPONSE: For purpose of summary judgment only, no dispute.**

7. None of these memes were created by Schneiter, let alone posted with any offensive intent. Instead, he posted them to invite dialogue and healthy debate

about matters of public concern. Indeed, at least one of these postings generated comments and dialogue. Id. at ¶ 9.

**RESPONSE: No dispute that this is what Schneiter states, without evidence of actual posts and comments because it was destroyed by him or at his instruction. (See DPFOF 102, undisputed.)**

8. In July 2019, a Wisconsin Journal Sentinel reporter obtained partial screenshots of these memes, which excluded any context or comments, and reached out to Schneiter and to the DOC for comment. Id. at ¶ 10.

**RESPONSE: No dispute.**

9. While outside working hours, Schneiter contacted the reporter and explained the proper context of the postings. However, the reporter ignored Schneiter's explanation and published an article portraying Schneiter as a hateful bigot whose conduct threatened the proper functioning of the DOC.

**RESPONSE: Objection, argumentative. Plaintiff cites no evidentiary material; therefore, the court should not consider this proposed fact. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

10. In making the decision to terminate Schneiter, the Department articulated as its rationale that "[Schneiter's] postings furthermore impaired [his] ability to perform [his] duties as Deputy Warden[,] cas[t] public doubt about [his] ability to lead, cas[t] public doubt about [his] ability to treat inmates, staff, and members of the public fairly and impartially, sow[ed] discord and divisiveness, and

3

se[t] a poor example." Declaration of Nathaniel Cade, Jr., dated March 31, 2022, at ¶ 8, Ex. 19.

**RESPONSE: The citation does not support the proposed fact. Therefore, this proposed finding of fact should be disregarded. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (C) and (E).**

11. The DOC also stated that Schneiter's postings "eliminated [his] ability to act as a role model and as a supervisor", impaired the Department's rehabilitative mission, and made any supervisory actions he took "suspect". Id.

**RESPONSE: The citation does not support the proposed fact. (Dkt. 46 at 2.) Therefore, this proposed finding of fact should be disregarded. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (C) and (E).**

12. Additionally, Schneiter never had notice that social media postings could merit termination. The DOC did not, at that time, have in place a social media policy which set forth clear guidelines about what was acceptable and what was not. Schneiter's conduct was shoehorned into a set of policies that were an ill fit, because – as the Department recognized internally – there simply was not any policy that applied to Schneiter's conduct. The Department also disregarded its own progressive discipline policy, which limited immediate termination to a set of behaviors or practices that expressly did not include social media postings, and never considered if any other employee had incurred in similar conduct, and how he or she had been treated by the DOC.

4

**RESPONSE: Objection. Plaintiff cites no evidentiary material; therefore, the court should not consider this proposed fact. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

13.     Finally, the Department's decision to terminate Schneiter's employment was anchored in a deficient and haphazard investigation, which was carried out willy-nilly, with no agency-wide standards to make all Department-wide investigations uniform. The actual Facebook postings were never retrieved, and the investigators assumed that the screenshots provided by the Journal Sentinel reporter reflected the entire postings. Very few witnesses were interviewed, and then those witnesses that were interviewed either provided self-serving and unfounded testimony or testimony that proved irrelevant and unusable. A key witness suggested by Schneiter was never interviewed.

**RESPONSE: Objection. Plaintiff cites no evidentiary material; therefore, the court should not consider this proposed fact. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

14.     Schneiter did not supervise inmates, only about twenty percent of his everyday duties included communicating with inmates at all, and only ten percent involved interacting with government officials and relating to the community. Declaration of Nathaniel Cade, Jr., dated March 31, 2022, at ¶ 8 at 18-24, 94 (hereafter "Tr.").

**RESPONSE: For purpose of summary judgment only, no dispute.**

15. As a Deputy Warden, he was evaluated by the Department of Corrections annually, and his evaluations were consistently overall very good to above standards, particularly in relating to staff and inmates. Tr. 95, 104-105.

**RESPONSE: No dispute.**

16. In fact, Schneiter received several merit raises, due to his performance exceeding expectations. Tr. 108. As a Deputy Warden, Schneiter went above and beyond the call of duty.

**RESPONSE: No dispute as to first sentence. Object to second sentence as conclusory and argumentative and without citation to the record.**

17. He voluntarily overhauled and revised several Department handbooks and policies, which helped staff and reduced inmate complaints. Tr. 100-101, 110.

**RESPONSE: For purpose of summary judgment only, no dispute.**

18. Schneiter approved the flying of the Pride flag in the detention center for which he was responsible, in solidarity with the LGBTQ community. Tr. 135-137.

**RESPONSE: Disputed. Appellant's Ex. 42, discussed at Tr. 136 cited above, is an email dated June 10, 2019. [Prior to the email dated June 10, on April 2, 2019, Schneiter posted on his FB page, "Transgender "flag" has no place outside any elected officials office." (Ex. 527 at 155.)] Then on that same date, June 10, 2019, Schneiter posted on his FB page, "This is not about equality and respect. A LGBYQ flag has no business being flown on the same flagpole..." (Ex. 527 at 174) On June 22, 2019, Schneiter posted a meme showing an LGBTQ flag with the sentence, "If they have the right to fly**

6

theirs" followed by a Confederate flag with the text on top of that "We deserve the right to fly ours." (Ex. 501 at 4, DPFOF 42-43 (undisputed.) On August 22, 2019, Schneiter posted "OK, should not have replaced it even if for one day. And the article is correct that the LGBTQ flag is flying in the veterans park." (Ex. 527 at 208.)

19.  Schneiter also never received any discipline for either his performance or his conduct, much less for issues with inmates. Tr. 106.

**RESPONSE: No dispute.**

20.  Schneiter never received any corrective action for anything related to race, religion, or sexual orientation, and there were never any issues with Appellant's implementation of an affirmative action or civil rights compliance plan. Tr. 106-109.

**RESPONSE: No dispute.**

21.  Schneiter's Facebook account privacy settings limited access to his account to only people who he allowed to see his posts, which included no family members of inmates he might have supervised. Tr. 112.

**RESPONSE: Disputed. The Facebook posts were shared with a MSJ reporter two were published with an article on the front page of the MJS to which inmates have access. (DPFOF 77-78, 87 (undisputed.)**

22.  The complaint that eventually resulted in the termination of Schneiter's employment did not arise from the Department's monitoring of its employees' social media activity, nor from someone at the Department or an inmate in its custody, but from a set of screengrabs of dubious origin forwarded by a newspaper reporter to the

Department. Rather than a DOC employee notorious for his insensitive and bigoted views who obtained his predictable comeuppance, Schneiter was simply unfortunate in that a reporter picked up – and ran with – what should have been a non-story. Tr. 112.

**RESPONSE: No dispute as to the first sentence, except for "dubious origin" is disputed. (See DPFOF 32, 73, undisputed.) Also dispute the second sentence, that a Deputy Warden posting offensive memes on Facebook is a "non-story." (DPFOF 77-87, 144-154, 167-172 (undisputed.)**

23. Schneiter's unrefuted testimony is that he used, and continues to use, Facebook to foster healthy and respectful political debate among his Facebook friends, not to promote hatred or bigotry. Tr. 113-114.

**RESPONSE: Disputed that Schneiter is respectful, but not material for purposes of summary judgment. (See Ex. 527 at 58, 59, 74, 87, 91, 125, 132, 136, 137, 145, 147-154, 161-62, 207.)**

24. His Facebook postings tended to generate comments and reactions from his Facebook friends. However, the screenshots upon which the Department relied to ultimately terminate Schneiter somehow lack any comments in which he or his friends would have discussed the context or intent of the postings and were not taken by him. Tr. 115.

**RESPONSE: No dispute that this is what Schneiter states, without evidence of actual posts and comments because it was destroyed by him or at his instruction. (See DPFOF 102-104, undisputed, Ex. 527.)**

25. Schneiter had similar reasons for posting the other memes depicted in Exhibit 1, Tr. 123-133, 138-140. None of these things were posted to validate a position of bigotry or ideological extremism, but to criticize Facebook's arbitrary content policy (Exhibit 1, pages 1 and 2), to criticize how a political party takes African American voters for granted (Exhibit 1, page 3), to draw attention to the slippery slope of flying flags other than the national and state flags at the Capitol (Exhibit 1, page 4), and to criticize people who level charges of racism arbitrarily against people with whom they disagree politically (Exhibit 1, page 5).

**RESPONSE: No dispute that this what Schneiter states, without evidence of actual posts and comments because it was destroyed by him or at his instruction but he admits they can be construed as discriminatory in nature. (See DPFOF 102-104, undisputed; Ex. 527.)**

26. Schneiter was entitled to post on social media as a private citizen, as he did not identify himself as a Department employee in his Facebook page, and the Department has no evidence that he identified himself as such when he spoke with the Journal Sentinel reporter. Tr. 440, 460.

**RESPONSE: Dispute that Schneiter did not identify himself as a DOC employee on his Facebook page (See DPFOF 51-59 (undisputed) and that DOC has no evidence he identified himself as a DOC employee in communications with Marley. (See DPFOF 61-72, undisputed).**

27. Similarly, the Department's determination that Schneiter violated its media policy is unsupported by the evidence. Even assuming that a violation of this

9

policy, standing alone, justified termination, the fact is that the policy expressly exempted "speaking to members of the media outside work hours while not in uniform", and Schneiter spoke with the Journal Sentinel reporter at noon, when he was off duty. Ex. 4, Tr. 182. In fact, Schneiter testified that he was well-versed in – and had ample experience with – the media policy, and that his decision to call the reporter at noon was purposeful, precisely because he did not want there to be any appearance that he was speaking to the press while on duty. Tr. 182-184. Conversely, the Department has no evidence that Schneiter was on duty at that time. Tr. 327-328.

**RESPONSE: Dispute that Schneiter did not identify himself as a DOC employee on his Facebook page (See DPFOF 51-59 (undisputed) and that DOC has no evidence he identified himself as a DOC employee in communications with Marley. (See DPFOF 61-72, undisputed.)**

28. In its November 8, 2019 termination letter, the Department invoked Work Rules 2, 14, and 25 as the basis for its decision to terminate Schneiter. Ex. 19, Tr. 77. Specifically, these Work Rules proscribe the following conduct:1) Work Rule 2: Failure to comply with written agency policies and procedures; 2) Work Rule 14: Intimidating, interfering with, harassing, demeaning, treating discourteously, or bullying, or using profane or abusive language in dealing with others; and 3) Work Rule 25: Engaging in outside activities which may impair the employee's independence of judgment or impair the employee's ability to perform his/her duties as an employee of the state.

**RESPONSE:  No dispute.**

29. Division Administrator Makda Fessahaye was the DOC official who came up with the list of Department Work Rules that Schneiter supposedly violated. Tr. 254-255.

**RESPONSE:  No dispute.**

30. None of these Work Rules apply directly to purportedly inappropriate social media postings, and the Department has no evidence that Schneiter violated any of them. Specifically, the Work Rules in force at the time do not mention anything about social media postings, and the DOC did not have in place a social media policy at the time that Schneiter would have violated and thus violated Work Rule 2. Tr. 154; 171-172, 326.

**RESPONSE:  Disputed that no work rules prevent offensive, discriminatory Facebook posts directed at minority groups over which Schneiter exercises substantial authority and power. (See DPFOF 11-29, 104, undisputed.)**

31. The Department also has no evidence that Schneiter "intimidated", "harassed", "demeaned", or used "profane and abusive language" against any one specific individual or individuals, particularly staff or inmates, which renders Work Rule 14 inapplicable. Tr. 172-173; 460-461.

**RESPONSE:  Disputed. (See DPFOF 33-44, 66, 67, 77, 104, undisputed).**

32. The Department also no evidence that Schneiter's independence of judgment or ability to perform his duties was ever impaired, so Work Rule 25 is similarly ill-fitting. Tr. 106-109; 304; 473-474.

11

**RESPONSE: Disputed. (See, e.g., DPFOF 74, 79, 80, 114, undisputed.)**

33. Lieutenant Governor Mandela Barnes weighed in on social media, before the investigation of Schneiter had even begun, and publicly stated that Schneiter "had to go". Tr. 150.

**RESPONSE: No dispute but irrelevant to summary judgment.**

34. When pressed about whether the policies and Work Rules cited in Schneiter's termination letter were sufficiently and clearly applicable, Fessahaye stated that she "[didn't] know that it needed to be clear or unclear", that Schneiter somehow "knew that what he did was inappropriate", and that the Work Rules in question were not applied specifically, but "in general". Tr. 338; 460-461.

**RESPONSE: No dispute. Schneiter knew the posts were discriminatory. (See DPFOF 104, undisputed.)**

35. However, these goals and values are neither a policy nor a Work Rule. Tr. 310. They were also not specifically invoked as the reason for Schneiter's termination in his termination letter. Only the above-specified Work Rules were. Ex. 19. Additionally, while Fessahaye testified that "high-level" correctional officials like Schneiter were held to a higher standard than a correctional officer or entry level employee, there was no Department policy that supported this testimony, nor provided any guidance as to what these respective "standards" were, or at the very least, Fessahaye could not identify any that did. Tr. 246, 293-294. Another one of the grounds cited in support for Schneiter's termination was "serious misconduct", but the offenses listed as "serious misconduct" in Executive Directive 43 only apply to

employees who committed them while on duty, and the DOC did not have any evidence that Schneiter was on duty when he made the postings in question, and did not consider that factor anyway. Ex. 3, Tr. 327-328, 332.

**RESPONSE: Objection, argumentative. (See DPFOF 16, undisputed.)**

36. The Department did not have in place any policy which would have prohibited Schneiter from posting on social media platforms, nor one which contained standards and guidelines about which social media postings were appropriate and acceptable and which ones were not. Tr. 154, 181-182.

**RESPONSE: No dispute there was no specific social media policy. Disputed that specific standards and guidelines were needed to prohibit offensive, discriminatory Facebook posts directed at minority groups over which Schneiter exercised substantial authority and power. Other work rules prohibited Schneiter's offensive and inappropriate conduct. (See DPFOF 11-29, 104 undisputed.)**

37. Schneiter never had any notice as to what was appropriate or inappropriate for him to post on social media and that, absent such a policy.

**RESPONSE: Disputed that specific notice was needed to prohibit offensive, discriminatory Facebook posts directed at minority groups over which Schneiter exercised substantial authority and power. Other work rules prohibited Schneiter's offensive and inappropriate conduct. (See DPFOF 11-29, 104 undisputed.)**

13

38. Under express Department of Corrections policy, Schneiter was entitled to progressive discipline. Ex. 3. This means that, before terminating Schneiter, the Department was required to impose a lesser form of discipline, depending on the gravity of the offense and his prior disciplinary history. Id.

**RESPONSE: Disputed. Policies allow accelerated discipline to termination and skip of progressive discipline for serious acts and policy violations. (See Ex. 503 at 2-3; E.D. 2, Ex. 505 at 3, 6-8.)**

39. As a means of an exception to progressive discipline, Executive Directive 43 contains a list of "serious misconduct" that could result in bypassing progressive discipline and moving directly to termination. Ex. 3, Tr. 179.

**RESPONSE: No dispute as to E.D. 43. (But see E.D. 2, Ex. 505 at 3, 6-8.)**

40. The list consists of nine different things that are grave enough to warrant not having to expect the DOC to retain an employee who commits any of them. None of these offenses expressly reference social media. Id.

**RESPONSE: No dispute as to E.D. 43. (But see E.D. 2, Ex. 505 at 7-8.)**

41. Troy Enger, who conducted the investigation upon which the Department ultimately based its decision to terminate Schneiter, admits that he did not consider Schneiter's previous work history at all. Tr. 472-473.

**RESPONSE: No dispute.**

42. None of the policy or Work Rule violations pointed out in Schneiter's termination letter came from the list of "serious misconduct" offenses listed in in Executive Directive 43. Ex. 3, Tr. 179.

**RESPONSE: No dispute. (But see E.D. 2, additional serious acts of misconduct listed at Ex. 505 at 7-8.)**

43. At any rate, the offenses listed as "serious misconduct" only applied to employees who committed them while on duty. Tr. 327-328, 332.

**RESPONSE: Disputed. Only 1-4 apply to conduct while on duty. (Ex. 503 at 3.) The additional serious acts of misconduct identified by DOC in E.D. 2 do not require being on duty. (See Ex. 505 at 7-8.)**

44. Beier testified under oath that the DOC was "not required" to assess comparators before terminating.

**RESPONSE: Objection. Plaintiff cites no evidentiary material; therefore, the court should not consider this proposed fact. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E).**

45. Beier's testimony directly contradicted by the DOC's own representations in Purtue .Tr. 659. She separately testifies that Ms. Brown was tasked with "bring[ing] any information about comparable cases", and that the DOC "definitely would have looked for comparables", but that she doesn't recall if any had been found in Schneiter's case. Tr. 611, 644-646.

**RESPONSE: Dispute that Beier's testimony was contradictory in any way. Brown searched for comparators and DOC did not have other Deputy Wardens who had engaged in similar misconduct. (See DPFOF 133, undisputed.)**

15

46. There is, in fact, no evidence that the DOC identified any comparators before deciding to terminate Schneiter. Counsel for the DOC should have known that this is the policy, as Attorneys Rachel Bachhuber and Gesina Carson, counsel here for DOC, were also counsel for DOC in the Purtue case. See Cade Decl., at Ex. 1-4.

**RESPONSE: No dispute that DOC was unable to find other Deputy Wardens who engaged in similar misconduct before terminating Schneiter. Dispute that DOC failed to comply with policy. Brown searched for such comparators as per policy and could not identify any other high ranking DOC leaders who engaged in similar misconduct. (See DPFOF 133, undisputed.)**

47. The investigator, Troy Enger, never attempted to obtain the complete and original Facebook postings made by Schneiter and neglected or refused to interview more than two of the witnesses suggested by Schneiter. Tr. 441, 443.

**RESPONSE: Objection, argumentative. No dispute that Enger did not attempt to obtain the Facebook postings, Preston did. (See DPFOF 98, undisputed.)**

48. The Facebook postings depicted on Exhibit 1 are not the original postings. They are screenshots of the postings the origin of which the DOC has been unable to articulate. Tr. 41-44, 117, 143.

**RESPONSE: Objection, argumentative. Schneiter admitted the Exhibit (identified as Respondents Ex. 1 at the WERC hearing and Ex. 501 in this case) were posted by him. Dispute the origin is unkow, DOC received the**

**screenshots from Patrick Marley via email and Schneiter admitted he posted them. (See DPFOF 32, 73, undisputed.)**

49. At least one of the screenshots clearly reflects that there were comments on the posting that were not included in the screenshot. Ex 1, Tr. 295-296.

**RESPONSE: No dispute there appears to have been two comments listed on Ex. 501 at 1. (See DPFOF 33.)**

50. Only two of the many potential witnesses suggested by Schneiter wound up ever being interviewed by Enger. Tr. 206.

**RESPONSE: Objection argumentative. No dispute two of Schneiter's proposed potential witnesses were interviewed. (See DPFOF 108-109.)**

51. These two witnesses that Enger did interview provided virtually nothing of substance, as neither really had had much firsthand interaction with Schneiter. Tr. 497.

**RESPONSE: Objection, conclusory and argumentative. (See DPFOF 108-111, undisputed.)**

52. The named Defendants, Kevin Carr, Amy Pechacek, Kari Beier and Makda Fessahaye, all DOC employees, participated in a series of events that resulted in Schneiter's termination based on unclear applicability of work rules to Schneiter's situation.

**RESPONSE: Objection. Plaintiff cites no evidentiary material; therefore, the court should not consider this proposed fact. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E).**

53. Facebook provides users with the option to list their workplace.

**RESPONSE: Objection. Plaintiff cites no evidentiary material; therefore, the court should not consider this proposed fact. See DKT. 13,** ***Procedures to be Followed on Motions for Summary Judgment*** **II (A)4, (C) and (E).**

54. Makda Fessahaye, in essence Schneiter's superior, and Wisconsin Lieutenant Governor Barnes both commented publicly on this issue, and condemned Schneiter's postings as if he had intended them to be his own expressions of bigotry

**RESPONSE: Objection. Plaintiff cites no evidentiary material; therefore, the court should not consider this proposed fact. See DKT. 13,** ***Procedures to be Followed on Motions for Summary Judgment*** **II (A)4, (C) and (E).**

55. Schneiter was put on paid administrative leave pending the conclusion of the DOC's investigation into misconduct allegations.

**RESPONSE: Objection. Plaintiff cites no evidentiary material; therefore, the court should not consider this proposed fact. See DKT. 13,** ***Procedures to be Followed on Motions for Summary Judgment*** **II (A)4, (C) and (E).**

Dated: April 11, 2022.

JOSHUA L. KAUL
Attorney General of Wisconsin

s/Gesina S. Carson
GESINA SEILER CARSON
Assistant Attorney General
State Bar #1055162

RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

                        Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1672 (Carson)
(608) 266-0188 (Bachhuber)
(608) 294-2907 (Fax)
bachhuberrl@doj.state.wi.us
carsongs@doj.state.wi.us