IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RICHARD SCHNEITER,

        Plaintiff,

        v.                           Case No. 21CV0135

KEVIN CARR, AMY PECHACEK, ET AL.,

        Defendants.

## DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT

Defendants propose the following Replies to Plaintiff's Response to Defendants' facts in support of their motion for summary judgment.

**Parties and Witnesses**

1.      Starting in January 2015, Richard Schneiter was employed as the Deputy Warden (DW) for Department of Corrections (DOC), Division of Adult Institutions (DAI), Wisconsin Correctional Center System (WCCS). (Dkt. 23, Hearing Transcript (Tr.) at 16:24–17:8; Ex. 502.)

**RESPONSE: Undisputed that Plaintiff, Richard Schneiter began his position as Deputy Warden (DW) for the Department of Correction (DOC), Division of Adult Institutions (DAI), Wisconsin Correctional Center System (WCCS). (Dkt. 23, Hearing Transcript (Tr.) at 16:14–17:8; Ex. 502.)**

**REPLY: Undisputed.**

2.        Kevin Carr is the Secretary of the DOC. The Secretary's Office made the termination decision. (Carr Decl. ¶ 2.)

**RESPONSE: Plaintiff objects to this finding of fact because it should be determined to be unsupported, self-serving as it only relies on the declaration of Carr. It does not indicate who specifically in the Secretary's Office made the termination decision.**

**REPLY: Undisputed as a background fact.**

3.        Amy Pechacek was the Deputy Secretary of the DOC in 2019. The Secretary's Office made the termination decision. (Pechacek Decl. ¶¶ 2, 16.)

**RESPONSE: Plaintiff objects to this finding of fact because it should be determined to be unsupported, self-serving as it only relies on the declaration of Pechacek. It does not indicate who specifically in the Secretary's Office made the termination decision.**

**REPLY: Notwithstanding the objection, undisputed as a background fact.**

4.        Kari Beier is employed by the Wisconsin Department of Administration, Division of Personnel Management as the Executive Human Resources Manager for Region 2, Department of Corrections, Director for the Bureau of Human Resources (BHR).  She has held the position of BHR Director since 2011. (Beier Decl. ¶ 2.)

**RESPONSE: Plaintiff objects to this finding of fact in part because it should be determined to be unsupported, self-serving as it only relies on the declaration of Beier.**

**REPLY: Notwithstanding the objection, undisputed as a background fact.**

5.      Makda Fessahaye was appointed to the position of Administrator of the DOC's Division of Adult Institutions under Governor Tony Evers and Secretary Kevin Carr in 2019. Prior to that appointment, she worked as an attorney in DOC's Office of Legal Counsel. (Fessahaye Decl. ¶ 3.)

**RESPONSE: Plaintiff objects to this finding of fact because it should be determined to be unsupported, self-serving as it only relies on the declaration of Fessahaye.**

**REPLY: Notwithstanding the objection, undisputed as a background fact.**

6.      Quala Champagne was Schneiter's direct supervisor. Champagne is currently the Warden of the Wisconsin Correctional Center System (WCCS). (Champagne Decl. ¶ 2, Ex. 502 at 1.)

**RESPONSE: Plaintiff objects to this finding of fact in part because it does not specify when Champagne was Schneiter's direct supervisor.**

**REPLY: Notwithstanding the objection, undisputed as a background fact.**

7.      Troy Enger was a co-investigator for the personnel investigation into Schneiter. He has been employed by DOC for 21 years and has been a supervisor for 16 years. He currently serves as the Regional Chief in Region 1 with the Division of Community Corrections. Enger estimates he has participated in at least 100 personnel investigations. (Enger Decl. ¶ 2-4, 6.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Enger.**

**REPLY: Notwithstanding the objection, undisputed as a background fact.**

8.      Christine Preston was a co-investigator for the personnel investigation into Schneiter. In 2019, she was the Director of the Office of Victim Services and Programs and was regularly assigned as an investigator to conduct personnel investigations. She completed training in Administrative Investigations, including 40-hour Investigations Training, which included interview training, evidence collection and analysis and training on how to properly document.  She is also the co-chair of the DOC Investigations Committee and facilitates training to staff on how to conduct employee investigations. Preston has conducted approximately 20 personnel investigations. (Preston Decl. ¶¶ 2-4.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Preston. REPLY: Notwithstanding the objection, undisputed as a background fact.**

9.      Kelli Brown was hired by Corrections in 1995. She became the Human Resources (HR) Coordinator for Division of Adult Institutions (DAI) in 2004 and then promoted to an Employment Relations Program Specialist in 2012. Since 2014, she has served as the Employment Relations Program Coordinator (now re-classified as HR Program Officer for Employment Relations). (Brown Decl. ¶ 2.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Brown. REPLY: Notwithstanding the objection, undisputed as a background fact.**

10.     Tonja Hesselberg was hired by Corrections in 1994 as a Correctional Officer. Since 2012, she has served as the Director of the Office of Diversity and

Employee Services (ODES), which oversees the DOC's harassment and discrimination complaint process. (Hesselberg Decl. ¶ 2.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Hesselberg.**

**REPLY: Notwithstanding the objection, undisputed as a background fact.**

**Deputy Warden Position**

11.     Schneiter's Deputy Warden (DW) position included supervisory and supervisory-related functions such as hiring, training and orienting new employees, dismissing, disciplining, evaluating performance, counseling regarding work performance and settling grievances of WCCS employees. (Champagne Decl. ¶ 6; Dkt. 23, Tr at 18:2-15; Ex. 502.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

12.     Schneiter's DW position required performing the work of those he supervised, which included supervision of staff, ensuring that policies and procedures are adhered to and followed out in a proper manner, doing site visits at the centers, communicating with the staff and the inmates and sharing pertinent information with the warden. (Champagne Decl. ¶ 7; Dkt. 23, Tr. at 19:7-14.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

13.     Schneiter's DW position involved acting as liaison and providing accurate information to legislators, government officials, and other external individuals and organizations regarding WCCS programs (including communication with the community to ensure WCCS meets the goals of DOC, as well as the needs of the staff and inmates and promoting and enhancing a positive community relations program). (Dkt. 23, Tr. at 20:24-21:20; Ex. 502 at 7.)

**RESPONSE: Undisputed. However, Plaintiff further asserts that working with "other external individuals and organizations" did not include the use of his personal Facebook account. (Dkt. 23, Tr. at 20:15-20; Tr. At 173:20-25; 174:1-5)**

**REPLY: Undisputed.**

14.     Schneiter's DW position involved Implementation of Affirmative Action/Civil Rights Compliance Plan within areas of responsibility and in compliance with Federal and State Civil Rights law (including reviewing hiring selection process to ensure fairness and equal opportunity for all applicants; reviewing disciplinary actions, resignations, and dismissals for compliance with appropriate standards and rules; providing information and direction to supervised employees to ensure support for the Affirmative Action/Civil Rights compliance plan; participating in developing a plan to maximize use of resources to recruit minority staff; ensuring equal access and opportunity for staff to attend training and other career development activities; establishing expectations that will not tolerate prejudices, unfairness, and

harassment among staff or between staff and inmates. (Dkt. 23, Tr. at 21:21-23:7; Ex. 502 at 7-8.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

15.     The Deputy Warden position is a career executive position and considered by DOC to be a high-level official. (Champagne Decl. ¶ 8; Dkt. 23, Tr. at 245:20-24, 512:8-10.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

16.     DOC held Schneiter and deputy wardens to a higher standard than correctional officers and entry level employees, in part because, especially as a deputy warden, they were responsible for day-to-day operations at particular prisons and they were responsible for enforcing certain policies, procedures, and carrying out DOC's mission and values. (Champagne Decl. ¶ 8; Dkt. 23, Tr. at 247:11-20.)

**RESPONSE: Disputed in part. Schneiter's job duties required him to supervise other classified employees as well as lower-level supervisors, but not inmates. Roughly 50 percent was attributed to activities relating to supervisory responsibilities related to administration functions. The remaining work performed included the supervision of staff to ensure that policies and procedures were adhered to and followed in a proper manner.(Dkt. 23, Ex. 2; Tr. at 18:2-20:23.)**

**REPLY: Objection. Plaintiff's response does not sufficiently dispute this proposed finding of fact; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e) and *Procedures to be Followed on Motions for Summary Judgment* II(C) and (E).**

**DOC Mission, Vision, and Core Values**

17.     In 2019, under Governor Tony Evers' Administration, DOC leadership endeavored to make a more equitable and just environment and to treat people with humanity and with dignity and respect as related to the overarching goal of reforming the prison system. (Carr Decl. ¶ 3; Fessahaye Decl. ¶ 4; Dkt. 23, Tr. at 234:20-235:5.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

18.     Goals related to equity and inclusion were  communicated to the wardens and deputy wardens. (Tr. at 236:2-14.) DOC's mission, vision, and core values were posted on the DOC website. (Fessahaye Decl. ¶ 5; Dkt. 23, Tr. at 235:15-17; Ex. 525.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

19.     The DOC's vision tag line was used in official DOC documents and stated "Every Person - Every Family - Every Community Matters." (Fessahaye Decl. ¶ 5; Dkt. 23, Tr. at 235:21-24, 510:18-20.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

20.     To Schneiter, the DOC's vision meant "that no one is left behind, that everyone matters, and that there isn't going to be preferential treatment based on any reasons, that all people matter, and that efforts should be made to ensure that everyone gets the same opportunity to succeed." (Dkt. 23, Tr. at 39:4-12.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

21.     Schneiter defined every community to include the Latino, African-American, and Muslim communities. (Dkt. 23, Tr. at 40:3-6.)

**RESPONSE: Undisputed. However, further clarifying that Schnieter's definition of community was answered in his deposition as follows:**

**Q: And the term every community, what would that entail in your opinion?**

**A:  I think community isn't just a village or a tow or a city. I think the community is–could be, in a broader sense, recognized by a–the Latino community, the African American community, you know, the Muslim community. I think it's very broad, and I think that's the intent of that statement.**

**(Schneiter Dep. at 34:5-13).**

**REPLY: Undisputed.**

22.     To Schneiter, "the core values are integrity, to treat people with respect and dignity, maintaining integrity, things of that nature, including fair and equitable treatment of others." (Dkt. 23, Tr. at 40:10-14.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

23.      As a DOC supervisor, Schneiter was a person responsible for implementing the vision, mission, and core values of the DOC. (Fessahaye Decl. ¶ 7; Dkt. 23, Tr. at 40:15-19.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

24.      As a deputy warden, a leader of the center system, Schneiter served as a role model for subordinates in the chain of command. (Fessahaye Decl. ¶ 7; Dkt. 23, Tr. at 40:20-23.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

25.      At hearing, Schneiter agreed that when he fails to carry out the department's mission, vision and core values, he represents the department as a workplace that condones such behavior. (Dkt. 23, Tr. at 85:24-86:3.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

26.      The memes posted by Schneiter absolutely did not support the DOC's vision and caused harm to the DOC. (Dkt. 23, Tr. at 512:22-513:23.)

**RESPONSE: Disputed. Plaintiff objects to this proposed finding of fact as it misstates the facts. Schneiter Decl.  9**

**REPLY: Objection. Plaintiff's response does not sufficiently dispute this proposed finding of fact, that Deputy Secretary Pechacek believed and**

**testified the memes did not support DOCs vision and caused harm to DOC; therefore, this proposed finding of fact should be deemed undisputed pursuant to Fed. R. Civ. P. 56(e) and *Procedures to be Followed on Motions for Summary Judgment* II(C) and (E).**

**Diverse Population and Staff**

27.     The prison population generally and within WCCS where Schneiter was a supervisor was diverse and there were practicing Muslims in the prison system. (Fessahaye Decl. ¶ 8; Ex. 523 at 6-7; Ex. 524 at 1.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

28.     One of DOC's stated goals was to increase diversity in its workforce. WCCS had prisons in the Milwaukee, Kenosha, Racine, and Oshkosh area which already had a more divorce workforce. (Fessahaye Decl. ¶ 11; Dkt. 23, Tr. at 242:4-11.)

**RESPONSE: Disputed. Mischaracterization of Fessahaye testimony. The testimony of Fessahaye was that since WCCS had prisons in Milwaukee, Kenosha, Racine, and Oshkosh area, it lent itself to having a "divorce" workforce.   Divorce in the transcription may be meant to be "diverse" instead. (Dkt. 23, Tr. at 242:4-11.)**

**REPLY: Objection, argumentative. There is an obvious typo in the transcript which carried over into the PFOF. (Dkt. 23, Tr. at 242:6 versus 242:11.**

29.      Schneiter supervised a diverse workforce including African-Americans, Latinos, practitioners of Islam and staff who identified as LGBTQ. (Fessahaye Decl. ¶ 12; Dkt. 23, Tr. at 242:16-243:9.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

**Schneiter's Facebook Account**

30.      Schneiter had a FB page with 1200 friends, including a large number of people (too numerous to recall) who are either current or former DOC employees. (Tr. at 33:21-34:2. 47:19-21)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

31.      Those DOC employees Schneiter was friends with on Facebook included former secretaries, DAI administrators, former wardens, directors, administrators, correctional officers, sergeants, captains, at least one chaplain, and several incarcerated persons. (Dkt. 23, Tr. at 34:3-8; 36:9-22.)

**RESPONSE: Disputed. Plaintiff objects to this proposed finding as its overbroad and vague as to time and misstates the facts because it is unknown whether any of the Plaintiff's Facebook friends were incarcerated during the time the "memes" were posted.**

**REPLY: Objection. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact**

should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E).

32.     In 2019, Plaintiff Richard Schneiter posted five (5) separate Internet "memes" in his personal Facebook page. (Dkt. 1:4, ¶ 15.)

**RESPONSE: Disputed. Plaintiff objects to this proposed finding of fact as to whether there were only five "memes" posted to Plaintiff's personal Facebook page.**

**REPLY: Objection. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E)..**

33.     Specifically, Schneiter shared a meme on his Facebook page that compared Muslim children to garbage.



(Ex. 501 at 1.)

**RESPONSE: Disputed. Plaintiff objects to this finding of fact as it misstates the facts. Plaintiff admits the fact he reposted a meme that depicted a Muslim woman comparing her children to garbage bags. It seeks to imply that he was comparing the Muslim woman's children to garbage bags, which he was not. Also, the picture posted is not an accurate depiction of what appeared on the Plaintiff's Facebook page.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E).**

34.       Schneiter agreed this meme would be viewed as inappropriate by the Muslim Community. (Dkt. 23, Tr. at 47:10-24.)

**RESPONSE: Disputed. Plaintiff objects to this finding of fact as it mischaracterizes testimony.  Schneiter testified that Defendant's Exhibit 1, page 1 would be viewed as inappropriate by the Muslim Community. (Dkt. 23, Tr. at 47:10-13.)**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this proposed finding of fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (C) and (E).**

35.       This meme was shared and was potentially visible and available to be viewed by 1200 of Schneiter's Facebook friends. (Dkt. 23, Tr. at 47:10-24.)

**RESPONSE: Disputed in part.  Plaintiff objects as to whether the meme as depicted in Defendants' Exhibit 1 page 1 as reference in Dkt 23 was posted on the Plaintiff's Facebook page. Undisputed as to the meme that was posted could be potentially visible and available to be viewed by Schneiter's 1200 Facebook friends.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E).**

15

36.     Schneiter did not preserve a copy of this meme or any comments (Ex. 501 at 1) before he deleted it. (Dkt. 23, Tr. at 47:25-48:2.) 1

**RESPONSE: Disputed in part.  Plaintiff objects as to whether the depicted in Defendants' Exhibit 1 page 1 as reference in Dkt 23 was posted on the Plaintiff's Facebook page. It is undisputed that he did not preserve a copy of the meme or the comments that were posted before he deleted it.**

**REPLY: Objection, argumentative and admission of spoliation of evidence. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

37.     Schneiter agreed that "if a person looks at Exhibit 1, page 1, on Facebook, one of the 1,200 people who you are friends with, there is nothing on Exhibit 1, page 1, that tells them that this is not [his] belief about Muslim children." (Dkt. 23, Tr. at 48:3-8.)

**RESPONSE: Disputed in part, the photo depicted is not that of Exhibit 1, page 1 referenced in the proposed finding of fact 38.REPLY: Objection. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed**

---

1 During the WERC hearing (Transcript at Dkt. 23), the exhibits were labeled Respondent's Ex. 1, 2, etc. They have been renumbered to Ex. 501, 502, etc., to comply with this Court's trial exhibit numbering practices.

undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

38.      Schneiter shared a meme on his Facebook page that suggested Muslims leaving the U.S. was "Bacon America Great Again."



(Ex. 501 at 2.)

**RESPONSE: Disputed in part, the photo depicted is not that of Exhibit 1, page 1 referenced in the proposed finding of fact 38.**

**REPLY: Objection, argumentative and baseless (citation is to page 2). Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed**

undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E).

39.     Schneiter agreed this depiction was offensive to Muslims, could be viewed by his 1200 Facebook friends, and there was nothing telling those friends that this was not his belief about Muslims.  (Dkt. 23, Tr. at 48:23-49:6.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

40.     Schneiter shared a meme stating "Black State Senator Leaves the Democrat Plantation.



(Ex. 501 at 3.)

**RESPONSE: Disputed in part. Plaintiff objects to this proposed findings of fact 38 as it is unknown if the picture posted is an accurate depiction of the meme and comments posted on the Plaintiff's Facebook page.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13,** ***Procedures to be Followed on Motions for Summary Judgment*** **II (A)4, (C) and (E).**

41.     Schneiter agreed this could be viewed by his 1200 Facebook friends, and there was nothing telling those friends that this was not his opinion about a black state senator and he supported this.  (Dkt. 23, Tr. at 49:7-20.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

42.     Schneiter posted a meme showing an LGBTQ flag with the sentence, "If they have the right to fly theirs" followed by a Confederate flag with the text on top of that "We deserve the right to fly ours."



(Ex. 501 at 4.)

**RESPONSE: Disputed in part. Plaintiff objects to this proposed findings of fact 42 as it is unknown if the picture posted is an accurate depiction of the meme and comments posted on the Plaintiff's Facebook page.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

43.     This flag meme was visible to Schneiter's 1200 Facebook friends and there was no text suggesting that this was not Schneiter's opinion. (Dkt. 23, Tr. 50:1-19.)

**RESPONSE: Disputed in part. Plaintiff objects to this proposed findings of fact 43 as it is unknown if the picture posted is an accurate depiction of the meme and comments posted on the Plaintiff's Facebook page.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E).**

44.     Schneiter shared a meme stating "I don't always get called racist. But when I do, I have just won an argument with a liberal."



(Ex. 501 at 5.)

**RESPONSE: Disputed in part. Plaintiff objects to this proposed findings of fact 44 as it is unknown if the picture posted is an accurate depiction of the meme and comments posted on the Plaintiff's Facebook page.**

**REPLY: Objection. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

45.      This meme was visible to Schneiter's 1200 Facebook friends and there was nothing on its face that would advise anyone viewing this that it was not Schneiter's belief. (Dkt. 23, Tr. 51:9-52:3.)

**RESPONSE: Disputed in part. Plaintiff objects to this proposed findings of fact  45 as it is unknown if the picture posted is an accurate depiction of the meme and comments posted on the Plaintiff's Facebook page.**

**REPLY: Objection. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (A)4, (C) and (E).**

46.      Schneiter had frequent discussions with a Facebook friend, Jay Graff. During one of those discussions, Schneiter told Graff that he had been a DOC employee for 40 years. (Dkt. 23, Tr. at 212:2-9.)

**RESPONSE: Undisputed**

**REPLY: Undisputed.**

47.      Schneiter claims DOC's decision to terminate him was based on political considerations. Schneiter agrees that comparing Muslim children to garbage is not a political position. (Dkt. 23, Tr. at 218:6-23.)

**RESPONSE: Disputed in part. Plaintiff admits that the decision to terminate him was based on political considerations. Plaintiff admits that comparing children to garbage is not a political position. However, the Defendant mischaracterizes the admission that one is not a political**

position as implying that politics was not a factor in deciding whether to terminate him. Defendants wish a conclusion to be drawn that is unsupported.

**REPLY: Objection. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (A)4, (C) and (E).**

48.     DOC HR Director, Andrea Bambrough, was Facebook friends with Schneiter. (Bambrough Decl. ¶ 3; Dkt. 23, Tr. at 226:21-228:19.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

49.     She saw many of Schneiter's posts but did not see the postings at issue in his termination until the newspaper article was published. (Bambrough Decl. ¶ 3; Dkt. 23, Tr. at 226:21-228:19.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

50.     If she had seen them, she would have reported the posts to her supervisor, Warden Champagne. (Bambrough Decl. ¶ 3; Dkt. 23, Tr. at 226:21-228:19.)

**RESPONSE: Plaintiff objects this proposed finding of fact as it should be determined to be unsupported, self-serving.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

51.     Schneiter repeatedly refers to his employment at DOC on Facebook. (Carson Decl. Ex. 527 at 32, 37, 40, 45, 113, 193, 240, and 305.)

**RESPONSE: Undisputed in part. Plaintiff admits referring to his employment at the DOC.  Plaintiff objects because the exhibit does not provide the context of each post.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

52.     On October 3, 2018, Schneiter posted "Glad you are doing well. MANY of us miss you here in DOC." (Carson Decl. Ex. 527 at 32.)

**RESPONSE: Undisputed in part. Plaintiff admits to referring to his employment at the DOC.  Plaintiff objects because the exhibit does not provide the context of each post.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this**

25

**response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

53.     On November 5, 2018, Schneiter posted "In my 41 years with the DOC I can honestly say you were not your typical DOC Secretary…" (Carson Decl. Ex. 527 at 37.)

**RESPONSE: Undisputed in part. Plaintiff admits to referring to his employment at the DOC.  Plaintiff objects because the exhibit does not provide the context of each post.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

54.     On November 28, 2018, Schneiter posted "729 vacant security positions in DOC now. At an all time high. 193 more vacancies than just one year ago. That's a 36% gain. Recruitment is not the problem. Retention is the problem. Efforts to halt this problem have proven to be ineffective and have fail miserably." (Carson Decl. Ex. 527 at 40.)

**RESPONSE: Undisputed in part. Plaintiff admits to referring to his employment at the DOC.  Plaintiff objects because the exhibit does not provide the context of each post.**

26

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

55.    On December 13, 2018, Schneiter posted multiple times:

> You would be an incredible asset to the DOC. You were the very best Marsha. All those times I needed funding when I was the Chief you never once turned me down. You are one of a kind. I miss you!
> ***
> I tried to do that for the DOC jobs but it shows all state jobs when I clicked on it.
>
> ***
> Please share and spread the word. Anyone can contact me if you want more information. The website has a series of short film provide an overview of a variety of positions. Just click the "Careers" tab.
>
> ***
> https://doc.wi.gov/Pages/Home.aspx
>
> ***
> Could be at institutions, Community Corrections field offices, central office. Where there are openings. You can go to the WI DOC website and follow the links to the job listings. Here is the link to the DOC Website: https://doc.wi.gov/Pages/Home.aspx

(Carson Decl. Ex. 527 at 45.)

**RESPONSE: Undisputed in part. Plaintiff admits to referring to his employment at the DOC.  Plaintiff objects because the exhibit does not provide the context of each post.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

56.     On March 5, 2019, Schneiter posted "Edward Brooke So you couldn't make it as a correctional officer? Boring??? You must of never worked in segregation. It's not fo everyone. I work for a living and have for almost 42 years with the DOC." ( Carson Decl. 527 at 113.)

**RESPONSE: Undisputed in part. Plaintiff admits to referring to his employment at the DOC.  Plaintiff objects because the exhibit does not provide the context of each post.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

57.     On August 2, 2019, Schneiter posted "I was fortunate to be a Major at GBCI. Dan and Hoot Kahelski (WCI) were the first 2 Majors in the DOC." (Carson Decl. Ex. 527 at 193.)

**RESPONSE: Undisputed in part. Plaintiff admits to referring to his employment at the DOC. Plaintiff objects because the exhibit does not provide the context of each post.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

58.     On September 28, 2019, Schneiter posted "42 years with the DOC. Had a great career. Not everyone is the same. Also, some of the information listed above is inflated and accurate. Just saying." (Carson Decl. Ex. 527 at 240.)

**RESPONSE: Undisputed in part. Plaintiff admits to referring to his employment at the DOC. Plaintiff objects because the exhibit does not provide the context of each post.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

59.     On March 31, 2020, Schneiter posted "In my 42 years with the DOC I never came across anyone I have more respect for than Randy. Warden Hepp consistently exhibit highest level of integrity and honesty and is my definition of what

29

a quality leader is. Always a good listener with an uncanny ability "calm the storm" during very difficult situations. I always enjoyed working with you Randy and FLCI's loss is certainly WCI's gain." (Carson Decl. Ex. 527 at 305.)

**RESPONSE: Undisputed in part. Plaintiff admits to referring to his employment at the DOC.  Plaintiff objects because the exhibit does not provide the context of each post.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

**Milwaukee Journal Sentinel Interview and Article**

60.     On July 16, 2019, Patrick Marley, a reporter from the *Milwaukee Journal Sentinel* contacted Schneiter via email (at 4:31 p.m.) and telephone (voicemail). (Dkt. 23, Tr. 52:17-53:2; Ex.513 at 39-40; Champagne Decl. ¶ 9.) \

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

61.     Marley directed the email to Richard.Schneiter@wisconsin.gov, addressed Schneiter as "Deputy Warden" in the email. (Dkt. 23, Tr. at 53:3-55:1; Ex. 513 at 39; Champagne Decl. ¶ 9.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

62.     Marley asked questions about the Facebook memes identified in Respondent's Exhibit 1 [Now Ex. 501]. (Dkt. 23, Tr. at 55:2-5.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

63.     The subject of the email was "Questions from Milwaukee Journal Sentinel re Facebook posts." (Champagne Decl. ¶ 10; Ex. 513 at 39.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

64.     Marley summarized the posts and asked Schneiter why they were posted and whether they were an accurate representation of his views. Marley also advised that he spoke to one of Schneiter's Facebook friends who said he did not think Schneiter should be working in his position at DOC. (Dkt. 23, Tr. 55:6-21; Champagne Decl. ¶ 10.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

65.     On July 17, 2019 at 8:55 a.m., Schneiter responded to Marley using his DOC email account. (Dkt. 23, Tr. at 55:22-56:5; Ex. 513 at 39.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

66.     Schneiter never denied he had posted these images described by Marley on his Facebook page. (Dkt. 23, Tr. at 56:17-20; Champagne Decl. ¶ 11.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

67.     Based on Schneiter's response to Marley, those posts or memes or screenshots shown in Exhibit 501 were posted by him. (Dkt. 23, Tr. at 57:2-58:13; Ex. 513 at 39; Champagne Decl. ¶ 11.)

**RESPONSE: Undisputed. However, further stating that Plaintiff would repost a variety of things on Facebook (that were not his own creation) and were not always his opinion but showed the different views of others to bring awareness to an issue or topic. (Dkt. 23, Tr. at 56:21-57:1.)**

**REPLY: Undisputed. Additional facts should be provided in a separate document. Dkt. 13 at II(D).**

68.     On July 17, 2019, at 12:10 p.m., Schneiter emailed his supervisor, Quala Champagne, and advised her as follows: "FYI. I just got off the phone with Mr. Marley. He intends to do a story on this today." (Dkt. 23, Tr. at 58:15-25; Ex. 513 at 39 Champagne Decl. ¶ 12.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

69.     Schneiter had a telephone call with Marley, knowing about DAI Media Policy 300.00.79, aware that Marley was a reporter, and did not have permission (via DOC Form 1927B) before speaking with or giving an interview to Marley. (Dkt. 23, Tr. at 59:1-13; Champagne Decl. ¶ 13.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

70.     After emailing Champagne, Schneiter communicated with Marley again via email from his DOC account, at 12:18 p.m., stating that he forgot to add that he was soon retiring from DOC for the second time. (Dkt. 23, Tr. at 220:1-6; Carson Decl. Ex. 530 at 2.) 2

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

71.     After emailing Champagne, Schneiter communicated with Marley again via email from his DOC account at 12:53 p.m. stating that he intended to retire on May 23 but would extend that for a couple months, he had not provided an date, but it will be very soon.  (Tr. at 220:7-15; Carson Decl. Ex. 530 at 1.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

72.     In none of those emails did Schneiter ever offer to or send the Facebook posts or alleged comments opposing the content to Marley. (Tr. at 219:20-220:20; Carson Decl. Ex. 530 at 1-3.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

73.     Fessahaye, Beier, and Pechacek first reviewed the memes posted by Schneiter via email dated July 17, 2019 at 10:46 a.m. (Fessahaye Decl. ¶ 28; Dkt. 23, Tr. at 249:8-18; Exs. 529 and 501 at 1-5.) 3

---

2 Exhibit 530 was introduced by Schneiter as Appellant's Ex. 32 at the WERC Hearing and received into the record.
3 Exhibit 529 was introduced by Schneiter as Appellant's Ex. 31 at the WERC Hearing and received into the record.

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

74.     Upon seeing these memes, Fessahaye was concerned that the memes were offensive and reflected poorly on DOC. (Fessahaye Decl. ¶ 30; Dkt. 23, Tr. at 250:2-7.)

**RESPONSE: Undisputed. Further adding that this was Fessahaye's opinion and not based on a formal social media policy.**

**REPLY: Undisputed.**

75.     Fessahaye also learned that Schneiter had communicated with the Journal Sentinel. (Fessahaye Decl. ¶ 30; Dkt. 23, Tr. at 250:8-14.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

76.     The DOC communications department provided a draft statement to Marley before the article was published. (Fessahaye Decl. ¶ 31; Dkt. 23, Tr. at 251:2-24; A-30.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

77.     On July 17, 2019, the Milwaukee Journal Sentinel published the article prepared by Marley: "Deputy prison warden posts Facebook meme that compares Muslim children to garbage." (Fessahaye Decl. ¶ 32; Dkt. 23, Tr. at 59:24-60:6; Ex. 507.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

78.     The article showed two of the memes posted by Schneiter. (Fessahaye Decl. ¶ 33; Dkt. 23, Tr. at 60:7-22; Exs. 501 at 1, 4 and 507.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

79.     When Champagne saw this article, she believed the article and memes did not align with the DOC's Harassment Executive Directive. (Champagne Decl. ¶ 15.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Champagne.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

80.     She was immediately concerned that it may impact Schneiter's ability to supervise racially and religiously diverse inmates and staff.  (Champagne Decl. ¶ 15.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Champagne.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

81.     Schneiter admitted he had previously commented on articles posted on the internet. (Dkt. 23, Tr. at 63:6-9.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

82.     Schneiter reviewed the article on both the internet and in the newspaper but did not comment on or attempt to explain why he posted such content on his Facebook page. (Dkt. 23, Tr. at 63:10-64:22.)

**RESPONSE: Undisputed. Further clarifying that Schneiter did attempt to discuss his intent with Marley prior to publication. Schneiter Decl. 9**

**REPLY: Undisputed.**

83.     Schneiter agreed that a post from a deputy warden read by a correctional officer or sergeant could have influence over that person because a deputy warden is in a position of power. (Dkt. 23, Tr. at 66:21-67:11.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

**Personnel Investigation**

84.     On July 18, 2019, Fessahaye initiated an investigation into Schneiter's FB postings and placed Schneiter on paid administrative leave. (Fessahaye Decl. ¶ 34.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Fessahaye.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

85.     There were several reasons Fessahaye placed him on administrative leave. First, given how high he was in the DOC chain of command, she thought it was appropriate that he was not on site to possibly obstruct the investigation. (Fessahaye Decl. ¶ 35.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Fessahaye.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13,**

Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).

86.      Second, Fessahaye wanted to demonstrate that Schneiter's views did not represent those of DOC. (Fessahaye Decl. ¶ 36.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of the Fessahaye.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

87.      Third, Fessahaye believed Schneiter's presence during the ongoing investigation could pose a risk to his safety should he visit institutions [because inmates have access to the *Milwaukee Journal Sentinal*.] (Fessahaye Decl. ¶ 37; Dkt. 23, Tr. at 253:13-254:4.)

**RESPONSE: Plaintiff objects as this finding of fact denotes Fessahaye's opinion regarding whether Schneiter's presence posed a safety risk.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13,**

38

**Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

88.     Fessahaye identified potential work rule violations including Executive Directives 2, 5, and 43 and Work Rules 2, 14, and 25. (Ex. 513 at 1.) E.D. 2 outlines employee discipline and lists serious acts of misconduct (9 standard acts from DOA and an additional 5 serious acts instituted by DOC) that can lead to termination. (Fessahaye Decl. ¶ 38; Ex. 505 at 7-8.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

89.     E.D. 5 is the employee harassment and discrimination policy, which governs conduct both inside and outside of the workplace. (Fessahaye Decl. ¶ 39; Dkt. 23, Tr. at 257:20-258:15; Ex. 506.)

**RESPONSE: Undisputed in part. It is clear that "E.D." is the Executive Directives that govern employee misconduct. However, there was no social media policy in effect at the time of Plaintiff's termination. (Fessahaye Dep. 47:14-17.)**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this proposed finding of fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (C) and (E).**

90.     Under E.D. 5, Section VI, Prohibited Behavior, the posts could be considered derogatory, offensive, or unwelcomed, which can include jokes, epithets,

slurs, and negative stereotyping. The section that prohibits distribution, display or discussion of offensive, written or graphic material also applied. (Fessahaye Decl. ¶ 40; Dkt. 23, Tr. at 258:16-259:6; Ex. 506 at 4.)

**RESPONSE: Undisputed to the fact that such policy contains this language. However, DOC had no policy regarding the use of social media during outside working hours. Schneiter Decl. 15**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this proposed finding of fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (C) and (E).**

91.     Because of Schneiter's position as deputy warden, E.D. 5, Section VI, Responsibilities of manager, supervisor, and designee of the appointing authority applied as he was expected to field and take seriously complaints and allegations of harassment. (Fessahaye Decl. ¶ 41; Dkt. 23, Tr. at 259:7-260:1; Ex. 506 at 5.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

92.     Schneiter received notice of the investigation and potential work rule violations. (Fessahaye Decl. ¶ 42; Dkt. 23, Tr. at 67:17-25; 255:3-16; Ex. 513 at 1.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

93.     As the DAI Administrator, Fessahaye served as the appointing authority because the investigation into Schneiter's conduct involved a high-level

employee and his direct supervisor, Warden Champagne was a potential witness. Fessahaye assumed responsibility for following the progress of the investigation, requesting updates, and reviewing the investigation at different stages. (Fessahaye Decl. ¶ 45; Dkt. 23, Tr. at 263:1-24.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

94.     On July 18, 2019, Fessahaye assigned Enger and Preston to conduct the Schneiter Personnel Investigation. (Fessahaye Decl. ¶ 43, Ex. 510; Enger Decl. ¶ 6; Preston Decl. ¶ 7.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

95.     Enger and Preston received initial documents such as Forms 1271 A-H, emails, exhibits and sample notification templates. (Enger Decl. ¶ 6; Preston Decl. ¶ 7; Ex. 510.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

96.     Before being assigned to this investigation, Enger did not know Schneiter and Preston was familiar with Mr. Schneiter professionally but did not work with him closely. (Enger Decl. ¶ 6; Preston Decl. ¶ 8.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declarations of Enger and Preston.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

97.      Enger and Preston prepared and organized the personnel investigatory packet for the Schneiter investigation. The packet contains 80 pages. (Enger Decl. ¶ 8; Ex. 513.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

98.      Prior to the Schneiter interview, Preston attempted to view the comments mentioned by Schneiter by going to his FB page. Through a search using his name, Preston could only locate a photograph of Schneiter and a female showing his page. (Preston Decl. ¶ 9; Ex. 513 at 35.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

99.      On July 24, 2019, Enger and Preston interviewed Schneiter. (Enger Decl. ¶ 10; Preston Decl. ¶ 9; Ex 513 at 5-11.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

100.      During the interview, Schneiter summarized his job duties:

There is 14 centers, approximately 2,000 inmates, and 460 staff, I believe. I am responsible for program implementation, security, treatment, food service,

maintenance. I supervise the management services director, program director, security director, and directly supervise four superintendents. I am second in command in WCCS and support the warden and the goals she has for the center system.

(Ex. 513 at 5.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

101.　　　Schneiter stated he had full control of his Facebook page. He admitted posting the memes at issue in the investigation (Ex. 501 at 1-5). (Ex. 513 at 6-8; 30-34.)

**RESPONSE: Undisputed. Further clarifying, however, that Schneiter and his son had full access to Schneiter's Facebook account. (Tr. at 69:16-24; 82:18-22.)**

**REPLY: Undisputed.**

102.　　　Schneiter said he posted the memes to get a conversation started. Enger and Preston asked Schneiter for the alleged comments he had made when sharing the memes but Schneiter stated they had been deleted and he had asked his son to delete them. (Enger Decl. ¶ 11; Preston Decl. ¶¶ 11-12; Ex. 513 at 6-8.)

**RESPONSE: Disputed in part. Plaintiff asserted at the hearing and numerous times throughout his deposition that the memes were deleted either by him or his son but that he could not remember specifically asking for any Facebook post in particular to be deleted. (Schneiter Dep. at 53:10-55:15; 62:6-25; 67:13-22; 68:13-18; 103:7-102:1).**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this proposed finding of fact should be deemed undisputed. See DKT. 13,** *Procedures to be Followed on Motions for Summary Judgment* **II (C) and (E).**

103.    The download of Schneiter's Facebook account shows many other postings but does not show any such comments; the memes at issue and any alleged comments were completely deleted. (Ex. 527.)

**RESPONSE: Undisputed. Further adding that Plaintiff would often delete memes that were no longer part of a larger discussion on his Facebook page. He stated that once the discussion was done, he would remove it from his account. This could be within a day or two, or sometimes several hours after. (Schneiter Dep. at 39:9-23).**

**REPLY: Undisputed. Additional facts should be contained in another document. See Dkt. 13 at IIB.**

104.    Enger noted during the interview that he asked Schneiter if he was familiar with E.D. 5, the Employment Harassment and Discrimination Policy. Schneiter said he was and admitted the memes standing by themselves could be construed as discriminatory in nature. (Enger Decl. ¶ 12; Ex. 513 at 8.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

105.    Enger noted that after being contacted by Patrick Marley, Schneiter told Enger that he called him and had an 8-10 minute conversation. He was aware of the

DAI Policy 300.00.79 titled Media. He did not complete the Form 1927B before calling and speaking with Marley. He communicated with Marley using his DOC computer. (Enger Decl. ¶ 13; Ex. 513 at 9.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

106.     Enger noted during the interview, Schneiter admitted he was Facebook friends with Jay Graff and "at times" had discussions with him on FB. Schneiter told Graff that he had worked for DOC for over 40 years during one exchange. (Enger Decl. ¶ 14; Ex. 513 at 9-10.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

107.     During the interview, Enger and Preston invited Schneiter to send them suggested people to interview. (Preston Decl. ¶ 13.)

**RESPONSE: Plaintiff objects this finding of fact should be determined to be unsupported, self-serving as it only relies on the declaration of Preston.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

108.     On August 1, 2019, Schneiter sent an email to Enger and Preston asking them to interview certain people (current and former DOC employees who are

Facebook friends) in the investigation. (Enger Decl. ¶ 15; Preston Decl. ¶ 14; Ex. 513 at 60.)

**RESPONSE: Undisputed in part. Plaintiff sent an email to Enger and Preston on July 28, 2019, following up with his request during his investigatory interview. He requested that current employees as of August 1, 2019, be interviewed: Dan Winkleski, Chris Buesgen, Ron Molnar, Brad Hoover, Wes Ray, Daisy Chase, Melissa Schueler, Chuck Pearce. He requested that a few former employees who were his Facebook friends be interviewed: Judy Smith, Tom Borgen, John Bet, Steve Beck, Marianne Cooke, Tim Haines, Ed Wall, and Kathy Nagle. Schneiter Decl.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

109.    Preston and Enger took a random sample of people to interview because they could not interview 1200 FB friends. They interviewed Chris Buesgen and Wes Ray, both witnesses proposed by Schneiter. (Enger Decl. ¶ 15; Preston Decl. ¶¶ 15-16; Ex. 513 at 26-28.)

**RESPONSE: Disputed. Plaintiff objects this proposed finding of fact as it should be determined to be unsupported, self-serving.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

110.    Enger and Preston interviewed Wes Ray who indicated he was a friend of Schneiter on Facebook, but that he really was not familiar with any of the posts and didn't really recall seeing anything. (Enger Decl. ¶ 17.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

111.    Enger and Preston interviewed Chris Buesgen who also was a FB friend proposed by Schneiter.  Buesgen told us he had seen many posts by Schneiter that he "blanked" him for 30 days. Buesgen said he did not know why Schneiter would want to be engaged in controversial FB posts, especially given his position. (Enger Decl. ¶ 18; Dkt. 23, Tr. at 71:1-72:15, 412; Ex. 513 at 28-29.)

**RESPONSE: Plaintiff objects to this finding of fact as it mischaracterizes Buesgan statements to the interviewers.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

112.     Enger and Preston interviewed Stephanie Hove and Quala Champagne, at the request of DOC. (Dkt. 23, Tr. at 72:16-73:21; Ex. 513 at 21-24.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

113.     Champagne, as Schneiter's direct supervisor was interviewed to determine her perspective on potential DAI policy violations and Facebook posts as they related to Schneiter's position.  (Dkt. 23, Tr. at 413:16-414:1; Preston Decl. ¶ 17; Enger Decl. ¶ 19.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

114.     According to the Champagne interview, Schneiter was aware of the media policy and did not have permission to speak to the media. Champagne also stated that the memes would have a negative impact on the image of DOC, recruitment, and that in relation to recruitment efforts and as a leader in the DOC, this could impact staff he supervised. (Preston Decl. ¶ 18; Enger Decl. ¶ 20; Dkt. 23, Tr. at 414:17-415:8; Ex. 513 at 21.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

115.     Enger and Preston interviewed Hove, the Assistant Administrator of DAI; she was Warden Champagne's supervisor and Schneiter's indirect supervisor. Hove had institutional knowledge that Schneiter did not follow the media policy and did not have approval in advance of speaking to the media. It was Hove's belief that

Schneiter's actions compromised his ability to carry out policies and DOC's beliefs including diversity and inclusion. (Preston Decl. ¶ 19; Enger Decl. ¶ 21; Dkt. 23, Tr. at 416:19-417:19; Ex. 513 at 24-25.)

**RESPONSE: Plaintiff objects to this finding of fact as it mischaracterizes her testimony and the statement.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

116.     After conducting these four interviews, Enger and Preston determined that they had sufficient information and did not need to interview more people. (Preston Decl. ¶ 20; Enger Decl. ¶ 22; Dkt. 23, Tr. at 412:18-24.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

117.     On August 9, 2019, Enger and Preston prepared a summary of investigation findings. (Ex. 513 at 12-14.) They concluded Schneiter violated Work Rule 2 (Failure to comply with written agency policies and procedures by violating the DOC media policy 300.00.79 for providing the interview to Marley without approval); Work Rule 14 (Intimidating, interfering with, harassing, demeaning, treating discourteously, or bullying, or using profane or abusive language in dealing with others due to his admission that he posted the 5 memes on his FB page); and

Work Rule 25 (Engaging in outside activities which may impair the employee's independence of judgment or impair the employee's ability to perform his/her duties as an employee of the state due to his admission that he posted the five memes on his FB page). (Preston Decl. ¶ 21; Enger Decl. ¶ 23; Dkt. 23, Tr. 429:7-432:19; Ex. 513 at 13.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

118.     Enger and Preston submitted the summary of findings and conclusions to Jocelyn Schoeneck, HR department, (Preston Decl. ¶ 22; Enger Decl. ¶ 24; Dkt. 23, Tr. at 272:21-273:3; Ex. 513 at 13.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

119.     The Employment Relations (ER) office is consulted by the appointing authority and HR Director upon completion of an investigation into employee misconduct, to determine whether work rules have been violated.  (Brown Decl. ¶ 3.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

120.     This determination is made by the Infraction Review Team (IRT). The IRT included Kelli Brown, Jocelyn Schoeneck (HR Director), and Makda Fessahaye. After the IRT determined work rules had been violated, the next step is a pre-disciplinary meeting with the employee. (Brown Decl. ¶ 3.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

121.     The investigation proceeded to the pre-disciplinary meeting. Schneiter received notice, attended the August 27, 2019 meeting, and brought a personal representative, Brad Kosbab. (Preston Decl. ¶ 23; Enger Decl. ¶¶ 24-25; Ex. 513 at 15.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

122.     Enger and Preston attended the pre-disciplinary meeting and read the investigative summary and the potential work rules that were violated (Work Rule number 2, number 14, and number 25 and Executive Directive 5 and DAI policy 300.00.79.) (Preston Decl. ¶ 24; Enger Decl. ¶ 26; Dkt. 23, Tr. at 74:21-75:21; Ex. 513 at 13.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

123.     Enger and Preston invited Schneiter to provide information and mitigating facts for management to consider when making the discipline decision. Schneiter read a statement and provided a signed copy of the statement for consideration. (Preston Decl. ¶ 25; Enger Decl. ¶ 27; Dkt. 23, Tr. at 75:22-76:12; Ex. 513 at 15, 66-67.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

124.     Kosbab also read a statement and provided a copy to Enger and Preston. (Preston Decl. ¶ 26; Enger Decl. ¶ 27; Dkt. 23, Tr. at 75:13-21; Ex. 513 at 68.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

125.     Schneiter never provided comments or any information to Enger and Preston that showed he was opposing the content of those Facebook images. (Preston Decl. ¶ 27; Enger Decl. ¶ 28; Dkt. 23, Tr. at 81:20-81:13; 436:1-14.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

126.     Following the Pre-Disciplinary meeting on August 27, 2019, Enger and Preston had no further involvement. (Preston Decl. ¶ 28; Enger Decl. ¶ 29.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

127.     Based on Beier's many experiences as the HR manager and MAT member, and prior meetings with the Secretary's Office and extensive experience reviewing personnel investigations, she had no concerns over the quantity or quality of the Schneiter personnel investigation. (Beier Decl. ¶ 6.)

**RESPONSE: Disputed. Plaintiff objects this proposed finding of fact as it should be determined to be unsupported, self-serving as it relies only on the declaration of Beier.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this**

**response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

128.     Because of the IRT, DART, and MAT review process, if there are any problems or deficits in a personnel investigation, it could have been returned to gather any additional information if necessary. That was not needed in the Schneiter case. (Beier Decl. ¶ 7.)

**RESPONSE: Disputed. Plaintiff objects this proposed finding of fact as it should be determined to be unsupported, self-serving as it relies only on the declaration Beier.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).[4]**

**Disciplinary Recommendation**

129.     After completion of the pre-disciplinary meeting, the Disciplinary Action Review Team (DART), which included Brown, Fessahaye, and Schoeneck, discussed whether disciplinary action is warranted and at what level. After discussion during this meeting, DART recommended termination. (Brown Decl. ¶ 4.)

---

[4] Plaintiff has misnumbered the responses and missed No. 128. The following numbers are all off by one.

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

130.     After the DART recommendation, the next step is review by members of the DOC's Management Advisory Team (MAT). MAT members were Employment Relations (Brown), Human Resources Manager (Beier), Office of Diversity and Employee Services (Hesselberg), and Office of Legal Counsel (Olmanson).   (Beier Decl. ¶ 4; Brown Decl. ¶ 5; Hesselberg ¶ 3.)

**RESPONSE: Disputed.   Plaintiff objects to this proposed finding of fact because he is not in a position to know whether it is true.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

131.     The purpose of the MAT is to review the investigation and recommend discipline based on their areas of expertise. Human Resources (Beier) takes the recommendation to the Secretary's Office, Legal Counsel analyzes any potential legal issues, Office of Diversity looks at adverse impact or disparate treatment, Employment Relations looks at discipline decisions so they can gather information about comparable cases. (Beier Decl. ¶ 5; Brown Decl. ¶ 6; Hesselberg Decl. ¶ 4.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

132.     Brown prepared the summary of the investigation because Schneiter held a high level, career executive position; she also facilitated the MAT meeting. (Brown Decl. ¶ 9; Ex. 516; Beier Decl. ¶ 9.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

133.     During Brown's preparation of the summary, she looked for comparable cases. However, DOC did not have any comparable cases where a Deputy Warden engaged in similar misconduct. (Brown Decl. ¶ 11.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

134.     The MAT acts as a neutral body to review personnel investigations because they are reviewing the facts and evidence submitted and making a recommendation regarding a level of discipline based on the information gathered. For most of the investigations reviewed, the MAT members don't personally know or work directly with the subject of an investigation and do not have any emotional attachment to the outcome of the discipline.  (Beier Decl. ¶ 6; Brown Decl. ¶ 7; Hesselberg Decl. ¶ 5.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

135.     Members of the MAT do not participate in the personnel investigation. (Brown Decl. ¶ 8; Hesselberg Decl. ¶ 6.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

136.     Brown facilitated the MAT meeting on October 22, 2019. MAT discussed the facts surrounding the investigation, as set forth in the summary, and reached a discipline recommendation. (Hesselberg Decl. ¶ 7; Beier Decl. ¶ 10; Brown Decl. ¶ 12; Exs. 516-17.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

137.     Brown and Hesselberg recommended termination due to the inappropriate nature of the postings and the position held by Schneiter.   (Brown Decl. ¶ 13; Hesselberg Decl. ¶ 8.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

138.     Beier recommended termination because she believed the memes posted by Schneiter caused harm to the DOC by having a senior leader communicate beliefs (comparing Muslim children to garbage, homophobic, saying the Confederate flag is "our" flag) that are in conflict with the Department's mission and vision.  They were disparaging, discriminatory, harassing, and demeaning and impacted his credibility as a DOC leader with incarcerated persons and employees who may identify with the particular groups referenced in the memes. (Beier Decl. ¶ 11.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

139.     Beier believes that DOC expects executives to represent themselves well both on- and off-duty and these memes cast doubt on credibility and the ability to continue working in a leadership capacity. The memes cast doubt that anyone in a senior leadership position is acting fairly, equitably, and without bias which could cause climate issues at the facilities and result in physical harm to an incarcerated person or employee. (Beier Decl. ¶ 12.)

**RESPONSE: Disputed.   This proposed finding of fact is based solely on Beier's declaration and her subjective beliefs and therefore should be deemed unsupported and self-serving.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

140.     On November 5, 2019, Beier signed the disciplinary action routing slip as the BHR Director, Hesselberg signed as the ODES Director, and Brown as the ER Director. All MAT members supported the recommendation to skip to termination. (Hesselberg Decl. ¶ 9; Beier Decl. ¶ 13; Ex. 517.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

**Termination Decision**

141.     After MAT meets and makes a recommendation, the personnel investigation process moves to the Secretary's Office for the decision. (Beier Decl. ¶ 14.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

142.     On November 5, 2019, during a regular meeting discussing personnel related issues, Beier took the recommendation from the MAT (and the disciplinary routing slip) to the Secretary's Office and met with Secretary Carr and Deputy Secretary Pechacek. Prior to the meeting with the Secretary's Office, Beier reviewed the entire investigative packet so she could answer any questions. (Beier Decl. ¶ 15.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

143.     During this meeting, Secretary Carr and Deputy Secretary Pechacek received a general synopsis and discussed the work rules and the discipline recommendations. (Carr Decl. ¶ 6; Pechacek Decl. ¶ 9; Tr. at 619:20-620:16.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

144.     During the November 5, 2019 meeting, Pechacek determined that memes posted by Schneiter caused harm damaged DOC's credibility by having a senior leader communicate beliefs (comparing Muslim children to garbage, homophobic, saying the Confederate flag is "our" flag) that are disparaging, discriminatory, harassing, and demeaning and impacts anybody who is in the DOC's

58

care, employed by DOC, and DOC community partners who may identify with the particular groups referenced in the memes. (Pechacek Decl. ¶ 10.)

**RESPONSE: Disputed in part. Pechacek's determination of what is disparaging, discriminatory, harassing, and demeaning is subjective and unsupported by DOC workplace rules or directives because no policy discussed social media usage while not working. (Fessahaye Dep. 47:14-17.)]**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this proposed finding of fact should be deemed undisputed. See DKT. 13,** ***Procedures to be Followed on Motions for Summary Judgment* II (C) and (E).**

145.     The memes cast doubt that anyone in a senior leadership position is acting fairly, equitably, and without bias which could cause climate issues at the facilities resulting in physical harm to an employee or persons in DOC's care. (Pechacek Decl. ¶ 11; Dkt. 23, Tr. at 513:2-23.)

**RESPONSE: Disputed. Whether the memes cast doubt that Schneiter could act fairly, equitably, and without bias is a subjective belief stemming from Pechacek. (Pechacek Decl. ¶ 11; Dkt. 23, Tr. at 513:2-23.)**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this**

proposed finding of fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* **II (C) and (E).**[5]

146.     Pechacek found these memes damaged DOC's credibility by communicating discriminatory beliefs, mocking children and comparing them to garbage, referring to the Confederate flag, which is often used by white supremacists and certainly refers back to a time when people of color were enslaved, all completely against the mission of DOC and the goal of being equitable and fair. (Pechacek Decl. ¶ 11; Dkt. 23, Tr. at 513:24-514:11.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

147.     Pechacek was concerned that the posting of these memes could impact Schneiter's safety and the lives of others because prison is already dangerous without creating additional life/safety risks and animosity based on a belief that DOC (through Schneiter) was treating individuals differently based on religion, race, or sexual orientation. [6] (Pechacek Decl. ¶ 12; Dkt. 23, Tr. at 515:21-516:12.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

148.     Pechacek believed Schneiter's postings created risks not only for the individual that is distributing/displaying these memes, but all leadership and

---

[5] Plaintiff's numbers appear to be correct now. Note he has skipped No. 144 in their responses.

[6] As Deputy Secretary, Pechacek received updates on assaults on staff at DOC during weekly staff assault meetings. There were daily/weekly assaults on staff by inmates within the DOC institutions. (Tr. at 511:8-23.)

employees because Schneiter is managing 14 facilities. (Pechacek Decl. ¶ 13; Dkt. 23, Tr. at 518:7-20.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

149.     Pechacek had read the article about Schneiter's behavior on the front page of the *Milwaukee Journal Sentinel*, which exposed the disparaging comments to the vast readership throughout the state and nationally and further undermined the DOC mission and ability to perform daily operations. (Pechacek Decl. ¶ 14; Dkt. 23, Tr. at 519:10-23.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

150.     Pechacek understood Schneiter claimed he posted these memes to start a conversation or invite comment but she has never seen anything suggesting this was his reason. She would certainly have wanted to review any comments during the termination discussion. (Pechacek Decl. ¶ 15; Dkt. 23, Tr. at 529:3-530:3.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

151.     During the meeting with the Secretary's Office, Beier provided a general synopsis, answered questions, discussed the work rules and the discipline recommendations. (Beier Decl. ¶ 16.)

**RESPONSE: Plaintiff objects to this finding of fact because it should be determined to be unsupported, self-serving as it only relies on the declaration of the Beier.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

151A.    Secretary Carr considered the discipline recommendations and determined that Schneiter's posting on Facebook were not in line with the conduct and behavior expected by a DOC employee.  (comparing Muslim children to garbage, homophobic, saying the Confederate flag is "our" flag).  He also considered the negative impact on public confidence in DOC as well as the impact on Persons in our Care (PIOC) and DOC employees. (Carr Decl. ¶ 7.)

**RESPONSE: Plaintiff objects to this finding of fact because it should be determined to be unsupported, self-serving as it only relies on the declaration of the Secretary Carr.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

152.     The Secretary considered the recommendations of staff and ultimately concluded that Schneiter violated multiple DOC work rules which rose to the level of serious misconduct. As a result, the appropriate discipline to address Schneiter's actions was to skip progression and proceed to terminate his employment with DOC. Secretary Carr directed his staff to implement this decision on behalf of the Secretary's office. (Carr Decl. ¶ 8.)

**RESPONSE: Plaintiff objects to this finding of fact because it should be determined to be unsupported, self-serving as it only relies on the declaration of the Secretary Carr.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

153.     Ultimately, the termination decision was based on factors such as the life, safety, and climate risks throughout the agency and at the 37 facilities, the impact this would have if [Schneiter] remained at DOC, his credibility with not only DOC employees but the public to carry out our mission. All of those things had been destroyed by his actions. (Pechacek Decl. ¶ 16; Tr. at 531:20-531:8.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

154.     The Secretary's Office believed the only discipline that would show DOC did not condone Schneiter's behavior and views which were directly contrary to its mission, vision, and core values was termination of employment. (Pechacek Decl. ¶ 17.)

**RESPONSE: Plaintiff objects to this finding of fact because it should be determined to be unsupported, self-serving as it only relies on the declaration of Pechacek.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13, Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

155.     On November 5, 2019, Pechacek signed the disciplinary action routing slip on behalf of the Secretary's Office showing their final decision was "skip progression to termination." (Pechacek Decl. ¶ 18; (Dkt. 23, Tr. at 532:13-533:10; Beier Decl. ¶ 17, Ex. 517.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

156.     Following this meeting, Beier returned the disciplinary routing slip to Employment Relations (Brown). (Beier Decl. ¶ 18.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

157.     Brown discussed the case with her counter-part at DPM, Doug Thayer, who reviews agency requests for skips in progressive discipline.  (Brown Decl. ¶ 14.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

158.     Consulting with DPM is part of Brown's job duties as the Employment Relations Chief. After her discussion with Thayer, Brown added DOA/DPM's approval via her signature to the disciplinary routing slip. (Brown Decl. ¶ 14; Ex. 517.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

**Termination Letter**

159.     On November 8, 2019, DOC issued a termination letter to Schneiter. (Pechacek Decl. Ex. 519.) [7]

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

160.     The termination letter cited violations of Work Rules 2, 14, and 25. And advised that Schneiter's postings were in violation of Executive Directive 5, employee harassment and discrimination and the postings impaired Schneiter's ability to perform his duties as a deputy warden. (Ex. 519 at 1.)

**RESPONSE: Undisputed.**

---

[7] From the time Schneiter was placed on paid administrative leave, July 17, 2019, until his termination on November 8, 2019, Schneiter was not present in any DOC correction centers, facilities, or prisons. (Tr. at 77:3-18.)

**REPLY: Undisputed.**

161.     The letter referenced Schneiter's meme adopting the Confederate flag as "our" flag (noting the Confederate flag has long served as a symbol of slavery and white supremacy.) The memes' denigration of minorities, Muslims, and the LGBTQ community cast public doubt about Schneiter's ability to treat inmates, staff, and members of the public fairly and impartially, sow discord and divisiveness, and set a poor example. (Ex. 519 at 1.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

162.     The termination letter summarized DOC's decision that Schneiter's FB postings tended to have a detrimental effect on establishing and maintaining strong working relationships with a diverse workforce and community partnerships and could potentially interfere with DOC recruitment.  (Ex. 519 at 2.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

163.     The letter also noted that DOC's rehabilitative mission may be impaired when inmates become aware of apparent racial, religious, or sexual-orientation animus on the part of DOC employees and inmates may assume DOC's actions are a product of bias rather than well-founded and in pursuit of its mission. And expression of animus of this nature additionally creates safety concerns in the institutions. (Ex. 519 at 2.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

164.    The letter further stated that the DOC was committed to maintaining a work environment free from discrimination, harassment, and retaliation. And due to Schneiter's position as a deputy warden, higher restraint must be exercised in expressing his viewpoint on matters, especially those that fall outside of the job-related responsibilities. His views command more attention and he is held to a higher standard of ethical expectations both on and off-duty due to the level of position that he holds with the department. The public expects employees of the DOC, especially highranking employees, to behave with a high level of propriety. (Ex. 519 at 2.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

165.    Schneiter's duties included enforcing policies and procedures and ensuring the discipline, safety and security of staff and inmates. As a career executive, he was expected to serve as a DOC representative and an example of what it means to carry out DOC's mission, vision and core values. He could no longer perform these duties. (Ex. 519 at 2.)

**RESPONSE: Plaintiff disputes in part. The Defendants are correct as to the Plaintiff's duties.  However, the Defendant is incorrect to assert that the Plaintiff could no longer perform those duties. Schneiter Decl.**

**REPLY: Objection, argumentative. Plaintiff cites no evidentiary material in support of this response; therefore, the court should not consider this response and the fact should be deemed undisputed. See DKT. 13,**

**Procedures to be Followed on Motions for Summary Judgment II (A)4, (C) and (E).**

166.       On November 8, 2019, Fessahaye delivered the termination decision to Schneiter by telephone at 4:15 p.m. She read the contents of the termination letter and Schneiter also received a copy of the letter via email and regular mail. (Fessahaye Decl. ¶ 68; Ex. 518.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

**Publicity and Impact on Department**

167.       During the investigation, members of the public complained about Schneiter's Facebook postings. (Fessahaye Decl. ¶ 70; Exs. 508-09, 511.)

**RESPONSE: Disputed in part. While some members of the public may have complained, others clearly stated that the personal information on Plaintiff's Facebook page did not strike them as offensive or inappropriate. One of those individuals being Andrea Bambrough who Plaintiff requested be interviewed during his investigation. For unknown reasons, Andrea Bambrough was not interviewed. (Dkt. 23, Tr. at 207:7-10; 229:9-230:18).**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this proposed finding of fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (C) and (E).**

168.     On July 18, 2019, the *Wisconsin Muslim Journal* contacted DOC and requested an interview with Schneiter and others from DOC. (Fessahaye Decl. ¶ 72; Exs. 512, 514.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

169.     Kelli West (Religious Practices Coordinator) and Fessahaye were interviewed by Janan Najeeb on September 6, 2019. They could not comment specifically on the contents of the investigation. (Fessahaye Decl. ¶ 74.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

170.     On September 15, 2019, the *Wisconsin Muslim Journal* published an article about Schneiter's conduct. (Fessahaye Decl. ¶ 75; Ex. 515.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

171.     There was continued interest in Schneiter's actions and impact on DOC. Following Schneiter's termination, the New York Times published an article about Schneiter's Facebook postings and interviewed his attorney, Nate Cade. (Fessahaye Decl. ¶ 77; Exs. 522; Tr. at 88:25-89:23.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

172.     Schneiter read the NYT article; he agreed that anyone who read or subscribed to the New York Times also would have information about the Facebook

images that appeared in his Facebook account, that those images were not private, and that content lasts forever. (Dkt. 23, Tr. at 89:35-90:21.)

**RESPONSE: Disputed in part. When asked whether Schneiter agreed that Facebook content lasts forever, Schneiter responded "I believe so. I'm not certain." (Dkt. 23, Tr. at 90:10-21.)**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this proposed finding of fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (C) and (E). State Process**

173.     Schneiter grieved his termination through a Step 1 and Step 2 Grievance.  (Carson Decl. Exs. 520 and 521.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

174.     Schneiter then filed an appeal to the WERC asking for a just cause hearing. (Carson Decl. Ex. 528.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

175.     Hearing Examiner Peter Davis held a two-day hearing regarding Schneiter's termination on September 27 and 28, 2021. (Dkt. 23.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

176.     Schneiter was represented by counsel at the hearing, provided an opening statement, testified himself, and had the opportunity to call his own witnesses, and cross examine DOC's witnesses. (Carson Decl. ¶ 12; Dkt. 23.)

**RESPONSE: Undisputed in part.  Counsel on Schneiter's behalf was able to provide an opening statement, call witnesses, and cross examine DOC's witnesses.**

**REPLY: Objection, argumentative. The response does not sufficiently dispute the proposed fact with contradictory evidence. Therefore, this proposed finding of fact should be deemed undisputed. See DKT. 13, *Procedures to be Followed on Motions for Summary Judgment* II (C) and (E).**

177.     Following the hearing, the parties were given the opportunity to submit post-hearing briefs and responses.  (Dkt. 23, Tr. at 690.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

178.     The matter was fully briefed on January 4, 2022. A decision has not yet been issued. (Carson Decl. ¶ 14.)

**RESPONSE: Undisputed.**

**REPLY: Undisputed.**

Dated: April 11, 2022.

JOSHUA L. KAUL
Attorney General of Wisconsin

s/Gesina S. Carson
GESINA SEILER CARSON
Assistant Attorney General

State Bar #1055162

RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1672 (Carson)
(608) 266-0188 (Bachhuber)
(608) 294-2907 (Fax)
bachhuberrl@doj.state.wi.us
carsongs@doj.state.wi.us