IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RICHARD SCHNEITER,

                    Plaintiff,

        v.                                              OPINION and ORDER

KEVIN CARR, AMY PECHAEK, MAKDA                          21-cv-135-jdp
FESSAHAYE, and KARI BEIER,

                    Defendants.[1]

---

Plaintiff Richard Schneiter was a high-ranking official for the Wisconsin Department of Corrections, responsible for overseeing 14 facilities. He was terminated in 2019, after the *Milwaukee Journal Sentinel* ran a story about several internet "memes" that Schneiter had reposted on his Facebook page. The memes took aim at various groups, including Muslims, immigrants, Democrats, and liberals, and one of the memes stated that the Confederate Flag was "our" flag. The article was titled "Deputy prison warden posts Facebook meme that compares Muslim children to garbage," referring to a meme in which the author wrote that he made "an honest mistake" by initially concluding that two garbage bags were actually Muslim children.

After an investigation and a hearing, department officials issued a letter providing several reasons for Schneiter's termination, including that his speech would "cast public doubt about [his] ability to treat inmates, staff, and members of the public fairly and impartially, sow discord and divisiveness, and set a poor example." Dkt. 34-1. Schneiter contends that his

---

[1] The complaint also names "John Doe," "Jane Roe," and "ABC Insurance Company." But the deadline for amending the complaint has come and gone, and Schneiter hasn't identified any additional parties. So the court will disregard the unnamed defendants.

termination violated his constitutional rights to free speech and due process, and he sues four officials who were involved in the disciplinary process.

Defendants move for summary judgment on all of Schneiter's claims, Dkt. 27, and the court will grant the motion. Schneiter had a right under the First Amendment to express his views on his Facebook page, but when a public employee's speech threatens the effective operation of his workplace, he doesn't have a right to keep his job. That is the situation in this case. Schneiter's speech was not simply an expression of an unpopular viewpoint. Rather, defendants reasonably construed Schneiter's posts as attacks on various minority groups whose members work for and are served by the department. Under those circumstances, it was reasonable for defendants to conclude that allowing a supervisory official such as Schneiter to continue working for the department would not only undermine the perception of fairness held by employees, prisoners, and the public, but could also threaten safety and security within Wisconsin prisons as a result of increased tension caused by Schneiter's speech. The First Amendment doesn't require a government employer to give precedence to one employee's personal views over the employer's ability to prevent violence and discord in the state's correctional system. So defendants didn't violate Schneiter's right to free speech by terminating him.

Defendants are also entitled to summary judgment on Schneiter's due process claim. Schneiter contends that his pretermination proceedings were inadequate, but the notice and hearing that he received complied with the Constitution.

UNDISPUTED FACTS

The following facts are undisputed.

During the time relevant to this case, Schneiter was the deputy warden for the Wisconsin Correctional Center System, which is "a decentralized network of 14 minimum-security facilities located across the state. . . . Most inmates at a correctional center are beginning the transition process back to society."[2] Before serving as deputy warden, Schneiter had worked for the Wisconsin Department of Corrections in several other positions, beginning as a correctional officer in 1977.

Schneiter had many responsibilities as deputy warden. These responsibilities included hiring, training, supervising, evaluating, and disciplining employees; settling grievances; communicating with staff and the warden; visiting DOC facilities; acting as a liaison to state government officials and other outside organizations about the Correctional Center System; and ensuring compliance with department policies and procedures, including those related to civil rights laws.

In July 2019, a reporter from the *Milwaukee Journal Sentinel* obtained screenshots of five "memes" that Schneiter had posted on his personal Facebook page earlier that year:

---

[2] https://doc.wi.gov/Pages/OffenderInformation/AdultInstitutions/WisconsinCorrectionalCenterSystem.aspx.











The posts could be viewed by any of Schneiter's 1,200 Facebook "friends," including many department employees.

On July 16, the reporter contacted Schneiter, using his department email address, and the two set up a phone call. After the reporter spoke with Schneiter, the newspaper published an article titled "Deputy prison warden posts Facebook meme that compares Muslim children to garbage." Dkt. 32-6. The article quotes Schneiter as saying that the meme showing a Muslim woman and her child is "not funny. If anything, it's very offensive. But this is the type of stuff you see on Facebook. But it starts a discussion, which I try—which, I guess, that's what I do." As for the meme about being called a racist, Schneiter said that he "believe[s] we have to do something about immigration," and he's been told that he's a racist if he doesn't believe in "open borders." More generally, the article summarizes Schneiter's position to be that he was being "misinterpreted."

Defendant Makda Fessahaye, the administrator for the Division of Adult Institutions, first viewed the memes on July 17, the day the article was published. The following day, Fessahaye initiated an investigation and placed Schneiter on administrative leave. She assigned two employees to conduct the investigation, Troy Enger and Christine Preston. After reviewing the memes and interviewing witnesses, including Schneiter himself, Schneiter's direct supervisor, and two of Schneiter's Facebook friends, Enger and Preston concluded that Schneiter violated three workplace rules: (1) Work Rule 2, which requires employees to obtain approval before giving interviews to the media; (2) Work Rule 14, which prohibits intimidating, interfering with, harassing, demeaning, treating discourteously, or bullying, or using profane or abusive language; and (3) Work Rule 25, which prohibits employees from engaging in outside activities that may impair the employee's independence of judgment or

impair the employee's ability to perform his or her duties. An administrative body called the infraction review team concurred.

The next step was a "predisciplinary meeting" during which Schneiter had the opportunity to provide mitigating evidence or information. Schneiter attended the meeting, and he brought a personal representative. Schneiter and his representative both submitted statements.

After the meeting, a body called the disciplinary action review team recommended that Schneiter be terminated. That recommendation was reviewed by a body called the management advisory team. That team also recommended termination. Defendant Kari Beier, the director for the Bureau of Human Resources, took the team's recommendation to defendants Kevin Carr and Amy Pechacek, the department's secretary and deputy secretary. Carr and Pechacek concluded that Schneiter's conduct was so serious that termination rather than lesser discipline was warranted.

On November 8, 2019, Pechacek issued a letter terminating Schneiter, citing the same three rules that Fessahaye had cited. The letter provided several reasons for the termination:

- Denigration of minorities, Muslims, and the LGBTQ community cast public doubt on Schneiter's ability to treat inmates, staff, and members of the public fairly and impartially, sow discord and divisiveness, and set a poor example.

- Schneiter's posts would tend to have a detrimental effect on establishing and maintaining strong working relationships with a diverse workforce and community partnerships and could potentially interfere with department recruitment.

- Prisoners may assume that the bias reflected in the posts reflect on the beliefs held by other prison staff, interfering with the department's rehabilitative mission and creating safety concerns.

- Schneiter's duties included enforcing policies and procedures and ensuring the discipline, safety and security of staff and inmates. As a career executive, he was expected to serve as a department representative and an example of what it

means to carry out the department's mission, vision and core values. He could no longer perform these duties.

- Schneiter's status as a supervisor meant that his views command more attention, and his posts undermined his ability to act as a supervisor. His conduct is more likely to be viewed as representative of the conduct the department condones.

Schneiter filed a grievance about his termination. After it was denied at two administrative levels, he appealed to the Wisconsin Employment Relations Commission. The commission held a hearing and accepted briefing. A decision is pending.

ANALYSIS

Schneiter asserts three claims in his complaint, all of which challenge his termination from the Department of Corrections: (1) retaliation for exercising his right to free speech under the First Amendment; (2) failure to provide due process under the Fourteenth Amendment; and (3) retaliation for exercising his right to free speech under article I, section 3 of the Wisconsin Constitution. Defendants contend that they are entitled to summary judgment on all these claims.

On the First Amendment claim, defendants contend that the memes Schneiter posted on his Facebook page don't qualify as constitutionally protected speech because he was speaking as an employee rather than a private citizen, the memes don't raise issues of public concern, and the department's interests in an effective and efficient workplace outweigh any interest Scheiter had in posting the memes. On the Fourteenth Amendment claim, defendants contend that they provided Schneiter all the process he was due. On both federal claims, defendants contend that Schneiter can't proceed on any claims against them in their official capacity and that they are entitled to qualified immunity on the individual-capacity claims. On the claim under the Wisconsin Constitution, defendants contend that a federal court can't

provide a remedy for a violation of article I, section 3, and that, even if it could, the state constitutional claim fails for the same reasons as the First Amendment claim.[3]

The court concludes that: (1) defendants are entitled to summary judgment on the First Amendment claim because their interest in a safe and effective workplace outweighed Schneiter's interest in posting the memes; and (2) defendants are entitled to summary judgment on the Fourteenth Amendment claim because Schneiter hasn't identified any constitutional defects in the process he received. This makes it unnecessary to consider defendants' other arguments about Schneiter's federal claims. And because the parties agree that Schneiter's state-law claim rises and falls with his First Amendment claim, *see* Dkt. 47, at 19, the court will dismiss that claim as well.

## A. First Amendment

A First Amendment retaliation claim requires the plaintiff to show three things: (1) the plaintiff's speech was constitutionally protected; (2) the plaintiff suffered a deprivation likely to deter free speech; and (3) the plaintiff's speech was at least a motivating factor in the defendants' adverse actions. *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 571 (7th Cir. 2021). In this case, defendants challenge Schneiter's ability to meet the first element only, contending that the memes Schneiter posted on his Facebook account weren't protected under the First Amendment.[4]

---

[3] In their reply brief, defendants contend for the first time that Fessahaye and Beier can't be held liable because they didn't participate in the alleged violations of Schneiter's rights. Dkt. 48, at 5–6. Defendants forfeited this argument by failing to raise it in their opening brief. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

[4] Neither side's briefs discuss the part of Schneiter's termination letter that accused him of violating the department's media policies by failing to obtain approval before speaking to *Milwaukee Journal Sentinel*. Rather, all of the parties' free speech arguments are about the memes. As a result, the court won't consider whether Schneiter had a right to speak to the press without

The determination whether a public employee's speech is constitutionally protected includes multiple steps. First, the employee must show either that: (1) he was speaking as a citizen on a matter of public concern; or (2) his speech was neither at work nor about work. *See Harnishfeger v. United States*, 943 F.3d 1105, 1113 (7th Cir. 2019). Second, if the employee makes one of those showings, the burden shifts to the employer to show that its interest in promoting effective and efficient public service outweighs any interest the employee has in speaking out. *Chaklos v. Stevens*, 560 F.3d 705, 714–15 (7th Cir. 2009).

For the purpose of defendants' motion for summary judgment, the court will assume that Schneiter has satisfied his threshold burden. But the court will grant summary judgment to defendants on Schneiter's First Amendment claim because the undisputed facts show that it was reasonable for defendants to believe that Schneiter's speech would not only affect his ability to be an effective leader of a diverse staff, but could also lead to safety and security concerns within department facilities as a result of the divisive nature of the speech. These concerns provide ample support for the conclusion that the department's interests outweighed Schneiter's.

The court of appeals has identified seven factors, derived from *Pickering v. Board of Education*, 391 U.S. 563 (1968), that may be relevant to balancing the employee's interest in speaking against the employer's interest in running the workplace:

(1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers;

---

department approval or the extent to which his failure to obtain approval contributed to the decision to terminate him.

(2) whether the employment relationship is one in which personal loyalty and confidence are necessary;

(3) whether the speech impeded the employee's ability to perform her daily responsibilities;

(4) the time, place, and manner of the speech;

(5) the context in which the underlying dispute arose;

(6) whether the matter was one on which debate was vital to informed decisionmaking;

(7) whether the speaker should be regarded as a member of the general public.

*Matrisciano v. Randle*, 569 F.3d 723, 732–33 (7th Cir. 2009). Courts refer to the application of these factors as "*Pickering* balancing." *See, e.g.*, *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004).

It isn't necessary to discuss every factor, *Harnishfeger*, 943 F.3d at 1115, and the court shouldn't simply count up the factors to determine how many favor one side or the other, *Volkman v. Ryker*, 736 F.3d 1084, 1091–92 (7th Cir. 2013). Rather, the facts of the case may show that "one factor of great weight" offsets several other factors. *Id.* Specifically, it may be "determinative" if the speech at issue interferes with the employee's work or with the efficient and successful operation of the office. *Id.*

Keeping these factors in mind, the court concludes for three primary reasons that defendants were justified under the First Amendment in deciding to terminate Schneiter: (1) the nature of Schneiter's speech; (2) the nature of Schneiter's workplace; and (3) Schneiter's high-ranking status within the department.

First, as for the nature of Schneiter's speech, each of the memes at issue demeaned or even dehumanized a significant segment of the population. As noted by the newspaper article,

10

the first meme compared Muslim children to garbage, and it ridiculed the cultural practices of some members of that faith. The second meme also targeted Muslims, suggesting that they should leave the United States. The third meme compared the Democratic party to a "plantation" that enslaves African Americans. The fourth meme compared the LGBTQ pride flag to the Confederate flag, a prominent symbol of white supremacy. It went further by referring to the Confederate flag as "our" flag and the LGBTQ flag as "their" flag, suggesting that whoever posted the meme was aligning himself with white supremacists against the LGBTQ community. The fifth meme dismissed the concept of racism as nothing more than a tool that "liberals" use when they are losing an argument and suggested that being called a racist is something to be proud of.

Schneiter's reposting of the internet memes added little to the public discourse, which lessens defendants' burden in justifying their decision to discipline Schneiter. *See Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) ("The less serious, portentous, political, significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression."). But even if the court assumes that some of the memes raised issues of public concern, all of the memes were mocking, derisive, and juvenile. An employer is entitled to consider not just the ideas expressed by an employee, but also the manner in which he expresses those ideas. *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000) ("[T]he manner and means of the employee's protestation are key considerations in balancing the employer's and employee's interests."). *See also Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 474 (3d Cir. 2015) ("[I]nappropriate tone . . . could play a critical role in ascertaining the existence and likelihood of disruption."). The memes Schneiter

posted do not evince any attempt to have a serious debate on political issues; rather, they seem designed to only belittle minority groups and inflame those who hold opposing views.

Equally important, the Wisconsin Department of Corrections is a large organization with a diverse group of employees who serve a diverse group of people. The memes that Schneiter posted suggest not just disagreement, but hostility and contempt toward Muslims, racial minorities, liberals, the Democratic party, and members of the LGBTQ community, all of whom are employed and served by the department. It was reasonable for defendants to conclude that an employee who had expressed such disdain for so many groups of people could no longer be effective in his job. *See Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 977 F.3d 530, 540–41 (6th Cir. 2020) (use of racist speech by public employee who fielded emergency calls reasonably led employer and co-workers to "question whether they could rely on [the plaintiff] in their work," whether the plaintiff had the necessary judgment for the job, and whether she would act fairly when African Americans called for help); *Locurto v. Giuliani*, 447 F.3d 159, 182–83 (2d Cir. 2006) ("[E]ffective police and fire service presupposes respect for the members of those communities, and the defendants were permitted to account for this fact in disciplining the plaintiffs.").

Second, the court considers the nature of the Wisconsin Department of Corrections. It is well established that law enforcement employers are entitled to extra deference when determining whether speech is likely to disrupt the workplace. *See Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016); *Graber v. Clarke*, 763 F.3d 888, 897–98 (7th Cir. 2014); *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999). The court of appeals has applied the same level of deference in the corrections context. *See Volkman*, 736 F.3d at 1092. This is because safety, security, order, morale, and cooperation are even more important in those

settings than in the typical government workplace. *Lalowski v. City of Des Plaines*, 789 F.3d 784, 792 (7th Cir. 2015); *Volkman*, 736 F.3d at 1092.

The court relied on the special context of the prison setting in *Weicherding v. Riegel*, in which the court concluded that prison officials didn't violate the First Amendment by terminating a sergeant for expressing white supremacist views. 160 F.3d 1139, 1143 (7th Cir. 1998). The court reasoned that the prison was a "racially charged environment" and that "avoiding racially motivated violence is essential to the efficient and safe operations" of the prison. *Id.* The incendiary memes Schneiter posted raise similar concerns about potential violence in the prison.

The third important consideration is the nature of Schneiter's position. Schneiter was a high-ranking official who supervised many employees and communicated with many groups outside the department. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin v. McPherson*, 483 U.S. 378, 390 (1987). This is because "[t]he expressive activities of a highly placed supervisory . . . employee will be more disruptive to the operation of the workplace than similar activity by a low level employee with little authority or discretion." *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997). And "the views of managers are more likely to be attributed to the institution itself." *Weicherding*, 160 F.3d at 1143.

In a correctional setting, a perception that a deputy warden for 14 correctional facilities held discriminatory views against minority religions, races, and sexual orientations could lead those in department custody to conclude that the department held the same views. And that perception could lead to increased distrust, unrest, or even violence. Schneiter was also responsible for enforcing civil rights laws. It was reasonable for defendants to conclude that

13

Schneiter had no credibility in that area of his job in light of his speech. Minority employees could have little confidence in Schneiter's ability to promote antidiscrimination principles after he posted a meme minimizing the seriousness of racism. *Cf. Craig v. Rich Township High School District 227*, 736 F.3d 1110, 1119–20 (7th Cir. 2013) (school district was entitled to terminate high school guidance counselor who published relationship advice book with "hypersexualized" content and expressed sexist views because officials had a reasonable belief that students generally and female students especially would be reluctant to seek counseling from him once they inevitably learned about the book).

As the above discussion shows, most of the seven factors enumerated by the court of appeals strongly favor defendants: speech mocking many groups the department employs and serves would be likely to undermine discipline and harmony at the workplace; the correctional setting requires greater loyalty and confidence than other settings; Schneiter's ability to perform his daily activities would likely be impaired by tension with the many groups he insulted; the manner of Schneiter's speech didn't promote public discourse; the opinions expressed in the memes were not vital to any decisionmaking at the department; and Schneiter was not a member of the general public but rather a high-ranking official who represented the department.

The only factors that favor Schneiter are that he didn't make the speech in a work setting, and he was not directly commenting on specific, work-related issues. But the other factors favor defendants so strongly that the absence of a more explicit connection with Schneiter's work doesn't preclude summary judgment for defendants. Other courts have upheld discipline of public employees for engaging in speech on social media accounts when that speech could create disruptions at the workplace, regardless of whether the speech was about

14

the workplace. *See, e.g.*, *Bennett*, 977 F.3d at 540–41 (racist speech on Facebook); *Lindsay v. Cnty. of Cook*, No. 18 C 4659, 2020 WL 6509350, at *6 (N.D. Ill. Nov. 5, 2020) (Facebook posts discussing violence).

Schneiter cites *United States v. National Treasury Employers Union*, 513 U.S. 454 (1995) (*NTEU*), and *Janus v. American Federation of State, County,* & *Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), for the proposition that the government must "shoulder a heavier burden" when the employee's speech isn't at work or about work. Dkt. 47, at 16. But neither case supports Schneiter's contention. *NTEU* stated that the government's burden is "greater" in the context of "a sweeping statutory impediment to speech" that applies to "a massive number of potential speakers." 513 U.S. at 466–68. *NTEU* confirmed that *Pickering* applies to a "single supervisory decision . . . taken in response to actual speech," *id.* at 468, which is what Schneiter is challenging in this case. *Janus* reiterated that "the *Pickering* framework was developed for use . . . in cases that involve one employee's speech and its impact on that employee's public responsibilities." 138 S. Ct. at 2472. *See also Shreffler v. City of Kankakee*, No. 19-CV-2170, 2021 WL 6200764, at *26 (C.D. Ill. Sept. 28, 2021) (heavier burden under *NTEU* "only applies in considering general rules that affect broad categories of employees, because a speech-restrictive law with 'widespread impact' gives rise to far more serious concerns than could any single supervisory decision"). In *Harnishfeger*, the court concluded that the employee's speech—a book about being a phone sex operator—was neither at work nor about work, but the court still applied *Pickering* balancing without imposing a heightened burden on the employer. 943 F.3d at 1113.

Whether the employee's speech occurred at work or was directly about work are simply two factors to consider under *Pickering*. They don't affect the standard applied by the court.

15

In any event, it would be inaccurate to say that Schneiter's speech was divorced from the work setting. Schneiter says that only his Facebook "friends" could view the memes, but that included more than 1,200 people, many of whom worked for the department. Dkt. 50, ¶¶ 30–31. And though Schneiter didn't identify himself as a deputy warden for the department on his Facebook page, his posts often identified himself as a department employee, such as in posts in which he attempted to recruit new employees for the department. Dkt. 50, ¶ 55. *See also id.* ¶¶ 52–54, 56–59. So Schneiter should have expected that department officials would learn about his speech, and he should not have been surprised when the memes he posted generated interest from the media. This is not a situation in which an employee was punished for private thoughts.

The lack of a more direct connection between the memes and the workplace would carry more weight if Schneiter had not been such a high-ranking official for the department. *See Harnishfeger,* 943 F.3d at 1117 ("Harnishfeger's responsibilities with the Guard were so routine and clerical that she could not be viewed by a reasonable member of the public as speaking for the Guard on any matter."). Although Schneiter wasn't commenting directly on department policies, the memes he posted were indirectly related to numerous matters over which Schneiter had responsibility. And the memes reflected poorly on the department and would almost certainly have created significant disruptions at the workplace, regardless of whether they were about the department.

For these reasons, the court concludes that Schneiter's interest in posting the memes is outweighed by the department's interest in effective and efficient public service. Schneiter resists this conclusion on multiple grounds, but none are persuasive.

16

First, Schneiter says that the memes do not represent "the full picture of Schneiter's intent nor his personal beliefs regarding each topic." Dkt. 47, at 1. Schneiter repeatedly suggests throughout his briefs and proposed findings of fact that the screenshots are somehow misleading because they are missing "context or comments." Dkt. 49, ¶ 8. But its undisputed that the screenshots submitted by defendants in this case are the same screenshots they viewed before deciding to terminate Schneiter. Dkt. 50, ¶ 67.

Schneiter doesn't allege that he provided any "context" for the memes when he posted them. He says now that he posted the memes "to criticize Facebook's arbitrary content policy," "to criticize how a political party takes African American voters for granted," "to draw attention to the slippery slope of flying flags other than the national and state flags at the Capitol," and "to criticize people who level charges of racism arbitrarily against people with whom they disagree politically." Dkt. 49, ¶ 25. But he points to no evidence that he communicated his intent at the time. And though he says that the screenshots don't show the comments to the posts, he doesn't explain why comments from his Facebook friends would affect the analysis on whether *his* speech is protected. In any event, it's undisputed the Schneiter had an opportunity to provide defendants with any missing information during the disciplinary proceedings, but he declined to do that. Instead, he deleted the posts without preserving them. Dkt. 50, ¶¶ 36, 102.

Under *Pickering* balancing, the court assesses the employee's speech as the employer reasonably understood it, after adequate investigation, when making the decision to terminate the employee. *Greer*, 212 F.3d at 370–71. In this case, defendants were entitled to rely on the speech as it was presented to them, at least in the absence of any additional evidence provided

17

by Schneiter. Even now, Schneiter doesn't identify any specific way in which the screenshots were inaccurate or incomplete representations of what he posted.

Second, Schneiter says that there is no evidence that his posts created problems at work. This is a weak argument because Schneiter was placed on leave immediately after defendants learned about the speech, so there was no time for actual disruption to occur. *See Weicherding*, 160 F.3d at 1143 (lack of actual disruption "hardly proves anything" when employee was suspended a few days after his speech and the suspension continued until the employee's termination). In any event, a government employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," *Connick v. Myers*, 461 U.S. 138, 152 (1983), and courts grant "substantial weight to government employers' reasonable predictions of disruption." *Waters v. Churchill*, 511 U.S. 661, 673 (1994). In this case, it was reasonable for defendants not to wait because the potential for disruption was "readily apparent." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 791–92 (7th Cir. 2015). Schneiter's posts threatened relationships with many different groups of people, and the potential consequences of allowing Schneiter to continue representing the department were serious. Defendants "need not wait until a riot breaks out before acting to quell a dangerous situation." *Weicherding*, 160 F.3d at 1143.

Third, Schneiter says that he had a "spotless work history." Dkt. 47, at 14. An employee's work history may be relevant in many termination decisions, but Schneiter doesn't explain why it is relevant here. The question before defendants wasn't whether Schneiter had ably performed his job before the *Milwaukee Journal Sentinel* article was published. Rather, the question was whether Schneiter's speech undermined his ability to do his job going forward. It was reasonable for defendants to conclude that that staff and prisoners' perception of

Schneiter's ability to be fair was significantly undermined regardless of Schneiter's past performance.

Both case law and common sense provide ample support for defendants' conclusion that Schneiter could no longer perform his job effectively after his Facebook posts became public. Schneiter has cited no authority in which a court has ruled in favor of a public employee under remotely similar circumstances. The court will grant defendants' summary judgment motion on Schneiter's free speech claims.

**B.  Due Process Clause**

The Due Process Clause requires notice and an opportunity to be heard before depriving a person of life, liberty, or property. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). The parties agree that Schneiter's job with the department was his "property" within the meaning of the Due Process Clause because his employment contract required "just cause" for terminating him. *Schulz v. Green County, State of Wis.*, 645 F.3d 949, 952 (7th Cir. 2011) ("As a general rule, a government employee who may be discharged only for cause has a constitutionally protected property interest in her position and may not be removed from it without due process."). So the question is whether defendants provided Schneiter the process he was due.

Schneiter is still in the midst of challenging his termination before the Wisconsin Employment Relations Commission, and he doesn't identify anything deficient about that process.[5] But an employee may challenge the adequacy of the process he received *before* his termination even if his post-termination process was adequate. *Carmody v. Bd. of Trustees of*

---

[5] Neither side contends that Schneiter's due process claim is premature because he hasn't finished the process provided by the state, so the court doesn't consider that issue.

19

*Univ. of Illinois*, 747 F.3d 470, 475 (7th Cir. 2014). In this case, Schneiter says that he didn't receive adequate notice because defendants didn't discipline him under a rule that applied specifically to social media. And he says that the disciplinary proceedings before his termination were deficient because defendants disregarded the department's progressive discipline policy, they didn't identify other department employees who had received similar discipline under similar circumstances, they only interviewed two of the witnesses he suggested, and they "never attempted to obtain the complete and original Facebook postings." Dkt. 47. None of these contentions support a due process violation.

A more specific rule wasn't required. Criminal statutes must be clear enough that they give ordinary people fair notice of the conduct they punish and provide standards to prevent arbitrary enforcement. *United States v. Morris*, 821 F.3d 877, 879 (7th Cir. 2016). But "the government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees." *Greer,* 212 F.3d at 369. For example, the Supreme Court has stated that a rule prohibiting employees from being "rude" to customers provides sufficient notice. *Waters*, 511 U.S. at 673.

In *Greer*, the court held that workplace rules against insubordination, harassment and bringing the employer into "disrepute" were sufficient to put the employee on notice that he should not have issued a press release that "publicly excoriated [his supervisor] as a lesbian harboring 'radical agendas' and announced both [his supervisor and a coworker] to be 'homosexual women' despite the fact that neither had publicly declared their sexual orientation." 212 F.3d at 371–73. Similarly, Schneiter had adequate notice from the department rule that prohibits employees from engaging in outside activities that may impair the employee's ability to perform his or her duties.

As for the alleged failure to comply with the department's progressive disciplinary policy, identify similarly situated employees, or interview more witnesses, that wasn't required either. When, as in this case, adequate postdeprivation procedures are available, predeprivation process is adequate if it provides oral or written notice of the charges against the employee, an explanation of the employer's evidence, and an opportunity for the employer to present his side of the story. *Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 927 (7th Cir. 2007). Schneiter doesn't dispute that he received all of those things. Instead, he says that the department's own policies and procedures required more. Defendants deny that they failed to follow their own policies, but the court need not resolve that issue. It is well established that the government's failure to follow its own procedural rules does not violate the Due Process Clause. *Kvapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 715 (7th Cir. 2014); *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 773 74 (7th Cir. 2013). So any rule violations by defendants may be relevant to Schneiter's administrative proceedings, but they aren't relevant here.

As for the failure to obtain the "complete and original Facebook postings," Schneiter cannot blame defendants for that. It's undisputed that the department investigators tried to view the original postings, but they were unable to do so and that Schneiter deleted the posts without preserving them.

Schneiter received adequate notice and an opportunity to be heard before his termination. Defendants are entitled to summary judgment on Schneiter's due process claim.

21

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Amy Pechacek, Kevin Carr, Makda Fessahaye, and Kari Beier, Dkt. 27, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered June 1, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge